IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

      Plaintiff,

v.

QUICKEN LOANS INC.,

      Defendant.

Civil Action No. 1:15-cv-00613-RBW

**HEARING REQUESTED**

**DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS MOTION
TO STAY  OR TRANSFER IN LIGHT OF A FIRST-FILED
ACTION PENDING IN THE EASTERN DISTRICT OF MICHIGAN**

Jeffrey B. Morganroth
**MORGANROTH &
MORGANROTH, PLLC**
344 North Old Woodward Avenue
Suite 200
Birmingham, MI 48009
Tel.:  248.864.4000
Fax.:  248.864.4001
jmorganroth@morganrothlaw.com
D.C. Bar No. 421684

Thomas M. Hefferon
**GOODWIN PROCTER LLP**
901 New York Avenue, NW
Washington, DC  20001
Tel.:  202.346.4000
Fax.:  202.346.4444
thefferon@goodwinprocter.com
D.C. Bar No. 461750

*Attorneys for Quicken Loans, Inc.*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................... 1

STATEMENT OF FACTS ....................................................................................................... 4

ARGUMENT .......................................................................................................................... 8

I.   THIS CASE AND THE DETROIT ACTION SHOULD NOT BOTH PROCEED
     SIMULTANEOUSLY IN TWO SEPARATE COURTS. ................................................... 8

II.  THIS COURT SHOULD ALLOW THE EASTERN DISTRICT OF MICHIGAN TO
     ADDRESS FIRST WHICH COURT SHOULD RESOLVE THE PARTIES' DISPUTES. 11

III. ALTERNATIVELY, TO ELIMINATE THE DUPLICATION, THIS COURT SHOULD
     TRANSFER THIS ACTION TO THE EASTERN DISTRICT OF MICHIGAN. ............... 13

   A.   Under The First-Filed Rule, The Detroit Action, Rather Than This One, Should
        Proceed. .................................................................................................................... 13

   B.   The Detroit Action Should Proceed Because It Is Broader And Alone Can
        Comprehensively Resolve The Parties' Disputes. ....................................................... 16

   C.   The Other Factors Used To Choose Between Federal Forums Also Weigh
        Overwhelmingly In Favor Of The Detroit Forum. ......................................................... 19

      1.   Private Interest Factors ...................................................................................... 19

         a.   Plaintiff's choice of forum weighs against the District of Columbia. ........................ 19

         b.   Quicken Loans' preference for Detroit favors transferring this action. ..................... 22

         c.   The Government's claims arose in Michigan. ......................................................... 23

         d.   Detroit is the more convenient forum for the parties. .............................................. 25

         e.   Detroit is more convenient for the witnesses. ........................................................ 26

         f.   Access to the evidence supports a transfer to Detroit. ............................................ 28

      2.   Public Interest Factors ....................................................................................... 29

CONCLUSION ....................................................................................................................... 31

## TABLE OF AUTHORITIES

CASES:                                                                                    Page

*Bergmann v. U.S. Dep't of Transp.*,
    710 F. Supp. 2d 65 (D.D.C. 2010) ..........................................................................31

*Budget Rent A Car Corp. v. Miljack, Inc.*,
    760 F. Supp. 135 (N.D. Ill. 1991) ..........................................................................18

*U.S. ex rel. Bukh v. Guldmann, Inc.*,
    No. 11-C-3701, 2014 WL 1647148 (E.D. Ill. Apr. 24, 2014) ...............................24

*Chung v. Chrysler Corp.*,
    903 F. Supp. 160 (D.D.C. 1995) ............................................................................26

*Columbia Plaza Corp. v. Sec. Nat'l Bank*,
    525 F.2d 620 (D.C. Cir. 1975) ...............................................................................12

*Comptroller of Currency v. Calhoun First Nat'l Bank*,
    626 F. Supp. 137 (D.D.C. 1985) ............................................................................26

*Daimler-Chrysler Corp. v. Gen. Motors Corp.*,
    133 F. Supp. 2d 1041 (N.D. Ohio 2001) ...............................................................12

*DigiTrax Entm't, LLC v. Universal Music Corp.*,
    21 F. Supp. 3d 917 (E.D. Tenn. 2014) ........................................................3, 16, 18

*Drew Techs., Inc. v. Robert Bosch, L.L.C.*,
    No. 11-15068, 2012 WL 314049 (E.D. Mich. Jan. 31, 2012) ...............................11

*EMC Corp. v. Parallel Iron, LLC*,
    914 F. Supp. 2d 125 (D. Mass. 2012) ....................................................................11

*Entines v. United States*,
    495 F. Supp. 2d 84 (D.D.C. 2007) .........................................................................11

* *FHFA v. First Tenn. Bank N.A.*,
    856 F. Supp. 2d 186 (D.D.C. 2012) ............................................................. *passim*

*F.T.C. v. Cephalon, Inc.*,
    551 F. Supp. 2d 21 (D.D.C. 2008) .........................................................................20

* *F.T.C. v. Graco Inc.*,
    No. 11-cv-02239, 2012 WL 3584683 (D.D.C. Jan. 26, 2012)...................23, 29, 30

*Furniture Brands Int'l, Inc. v. U.S. Int'l Trade Comm'n*,
    804 F. Supp. 2d 1 (D.D.C. 2011) ...........................................................................13

*U.S. ex rel. Holbrook v. Brinks Co.*,
  No. 11-4732, 2013 WL 4731545 (D.N.J. Sept. 3, 2013) ........................................................24

*Holland v. ACL Transp. Servs. LLC*,
  815 F. Supp. 2d 46 (D.D.C. 2011) ......................................................................................30

*Int'l Painters & Allied Trades Indus. Pension Fund v. Painting Co.*,
  569 F. Supp. 2d 113 (D.D.C. 2008) .....................................................................................13

*McClamrock v. Eli Lilly & Co.*,
  267 F. Supp. 2d 33 (D.D.C. 2003) ................................................................................22, 23

*Montgomery v. STG Int'l, Inc.*,
  532 F. Supp. 2d 29 (D.D.C. 2008) ................................................................................19, 29

*N. Am. Airlines, Inc. v. Int'l Bhd. of Teamsters, AFL-CIO*,
  No. 04 Civ. 9949 (KMK), 2005 WL 646350 (S.D.N.Y. Mar. 21, 2005) .........................17, 18

*New Hope Power Co. v. U.S. Army Corps of Eng'rs*,
  724 F. Supp. 2d 90 (D.D.C. 2010) ...............................................................................19-20

*U.S. ex rel. Ondis v. City of Woonsocket*,
  480 F. Supp. 2d 434 (D. Mass. 2007) ...........................................................................20, 23

*Poku v. Fed. Deposit Ins. Corp.*,
  752 F. Supp. 2d 23 (D.D.C. 2010) ..................................................................................2, 9

*Pueblo v. Nat'l Indian Gaming Comm'n*,
  731 F. Supp. 2d 36 (D.D.C. 2010) ................................................................................29, 30

*Pyrocap Int'l Corp. v. Ford Motor Co.*,
  259 F. Supp. 2d 92 (D.D.C. 2003) .....................................................................................26

*Reiffin v. Microsoft Corp.*,
  104 F. Supp. 2d 48 (D.D.C. 2000) .......................................................................................9

*Save Power Ltd. v. Syntek Fin. Corp.*,
  121 F.3d 947 (5th Cir. 1997) ............................................................................................11

*Schmid Labs, Inc. v. Hartford Accident & Indem. Co.*,
  654 F. Supp. 734 (D.D.C. 1986) ........................................................................................19

*Schmitt v. JD Edwards World Solutions Co.*,
  No. C 01-1009 VRW, 2001 WL 590039 (N.D. Cal. May 18, 2001) ...................................18

*\* S.E.C. v. Ernst & Young*,
  775 F. Supp. 411 (D.D.C. 1991) .........................................................................19, 25, 26, 28

*S.E.C. v. Page Airways Inc.*,
    464 F. Supp. 461 (D.D.C. 1978) .................................................................................26, 28

\* *S.E.C. v. Roberts*,
    No. 07-407(EGS), 2007 WL 2007504 (D.D.C. July 10, 2007) ............................20, 24, 26, 28

*Silver Line Bldg. Prods. LLC v. J-Channel Indus. Corp.*,
    12 F. Supp. 3d 320 (E.D.N.Y. 2014) ..................................................................................12

*Stone & Webster, Inc. v. Ga. Power Co.*,
    779 F.3d 614 (D.C. Cir. 2015) ...........................................................................................14

*S. Utah Wilderness Alliance v. Lewis*,
    845 F. Supp. 2d 231 (D.D.C. 2012) ...................................................................................20

*Taylor v. Shinseki*,
    13 F. Supp. 3d 81 (D.D.C. 2014) .......................................................................................30

\* *UtahAmerican Energy, Inc. v. Dept. of Labor*,
    685 F.3d 1118 (D.C. Cir. 2012) .........................................................................2, 8, 9, 13

*Virts v. Prudential Life Ins. Co. of Am.*
    950 F. Supp. 2d 101 (D.D.C. 2013) ...................................................................................30

*Wash. Metro. Area Transit Auth. v. Ragonese*,
    617 F.2d 828 (D.C. Cir. 1980) ...........................................................................................13

## STATUTES:

28 U.S.C. § 1404(a) ...................................................................................................................9

31 U.S.C.§ 3732(a) ...................................................................................................................9

## RULES AND REGULATIONS:

24 C.F.R. § 203.257 .................................................................................................................23

## OTHER AUTHORITIES:

HUD Handbook 4155.1 1.A.2.d .................................................................................................15

HUD Handbook 4155.1 2.A.4.a.................................................................................................15

HUD Handbook 4155.1 4.A.2.g ............................................................................................15, 21

HUD Handbook 4155.1 4.E.4.f ................................................................................................15

Press Release, DOJ, United States Files Lawsuit Alleging that Quicken Loans
    Improperly Originated and Underwrote Federal Housing Administration-
    Insured Mortgage Loans (Apr. 23, 2015), *available at*
    http://www.justice.gov/opa/pr/united-states-files-lawsuit-alleging-quicken-
    loans-improperly-originated-and-underwrote .........................................................................16

FHA Connection, HUD.GOV, https://entp.hud.gov/clas/info2.cfm#hocs......................................15

FHA Homeownership Centers, HUD.GOV,
    http://portal.hud.gov/hudportal/HUD?src=/program_offices/housing/sfh/sfhho
    cs .............................................................................................................................................25

United States District Courts—National Judicial Caseload Profile, U.S. COURTS
    (Dec. 2014), *available at*
    http://www.uscourts.gov/Statistics/FederalCourtManagementStatistics/district
    -courts-december-2014.aspx ...................................................................................................30

**INTRODUCTION**

Defendant Quicken Loans Inc. ("Quicken Loans") moves the Court to stay this action or to transfer it to the United States District Court for the Eastern District of Michigan, because a previously-filed and largely overlapping action between the parties to this case is already pending in that court.

This case and the other action in the Eastern District of Michigan both are focused on the same occurrences and central questions, namely, whether mortgage loans made by Quicken Loans and insured by the Federal Housing Administration ("FHA") (a federal agency within the Department of Housing and Urban Development ("HUD")) were originated in accordance with applicable FHA guidelines.  Specifically, on April 17, 2015, Quicken Loans filed suit in that court against the United States (the plaintiff here), and other government parties, to bar the defendants from violating the long-established and legally-mandated process for determining whether those mortgage loans complied with applicable FHA guidelines, as well as a declaratory judgment that the FHA-insured loans that Quicken Loans originated from 2007 through 2011 conformed to those guidelines in material respects.  A copy of the complaint is attached as Exhibit A (the "Detroit Complaint").  Significantly, Quicken Loans' underwriting decision, certification of compliance with FHA's guidelines, and endorsement for insurance for each of the at-issue loans was made at Quicken Loans' offices in Detroit or its suburbs.

Despite the pendency of the Detroit Action, and rather than filing counterclaims in that case or a separate suit in that court, the United States subsequently filed this duplicative lawsuit in the District of Columbia, claiming that Quicken Loans violated the False Claims Act.  In this lawsuit, the United States—based on the very procedures that Quicken Loans has already challenged in the Detroit Action—alleges that some of the loans that Quicken Loans originated

1

in the same 2007-2011 period did not conform to FHA guidelines.  This is the precise substantive question that Quicken Loans has already presented for judicial determination in the Detroit Action, where the vast majority of the relevant events occurred and where most of the witnesses and documents are located.

The D.C. Circuit has made clear that "[c]onsiderations of comity and orderly administration of justice dictate that two courts of equal authority should not hear the same case simultaneously."  *UtahAmerican Energy, Inc. v. Dept. of Labor*, 685 F.3d 1118, 1124 (D.C. Cir. 2012) (citation and internal quotation marks omitted).  And to avoid such duplication, courts are empowered to stay or transfer overlapping lawsuits.  *Poku v. Fed. Deposit Ins. Corp.*, 752 F. Supp. 2d 23, 28-29 (D.D.C. 2010) (citing *Handy v. Shaw*, 325 F.3d 346, 349 (D.C. Cir. 2003)).

Courts have recognized that, when there are parallel federal cases, the court with the first-filed case should be the one to opine first on how the duplication should be resolved.  That practice promotes both comity and judicial efficiency.  Accordingly, this Court should temporarily stay this case in order to allow the Eastern District of Michigan to determine which court should address the parties' dispute.

Alternatively, if this Court decides to address that issue now, this Court should transfer this case to the Eastern District of Michigan.  This is so for three separate but mutually-reinforcing reasons.

***First***, the D.C. Circuit has explained that "[t]he usual rule in this circuit" is that the first-filed case normally is allowed to go forward, and other cases should yield.  *UtahAmerican Energy, Inc.*, 685 F.3d at 1124 (citations and internal quotation marks omitted).  Here, the Detroit Action was filed first and central issues in that case and this case are overlapping.  Accordingly, it should be the case to proceed.

That is particularly true because the United States' filing of this case in the District of Columbia, after Quicken Loans had already filed suit in Michigan, reflects patent forum shopping.  Nearly all of the challenged conduct in this suit occurred in Quicken Loans' offices located in Detroit, Michigan or nearby; indeed, every single person identified in the United States' complaint is located in Detroit, as are all of the documents referenced in the complaint. Grasping for some connection to the District of Columbia, the complaint alleges that the FHA has its headquarters here.  But this Court has held that the location of a federal agency's headquarters is not a material factor in choosing between judicial districts.  *FHFA v. First Tenn. Bank N.A.*, 856 F. Supp. 2d 186, 192 (D.D.C. 2012) (Walton, J.).  And further belying a strong linkage to this venue, it is telling that when it brought other False Claims Act lawsuits like this one, the United States sued in the Southern District of New York (where neither defendant nor HUD was located), and later consented to the transfer of one of those cases to Texas, where the defendant had filed a related lawsuit.[1]

***Second***, even apart from the first-filed rule, courts give preference to the broader case when two overlapping actions are pending.  *See, e.g.*, *DigiTrax Entm't, LLC v. Universal Music Corp.*, 21 F. Supp. 3d 917, 925 (E.D. Tenn. 2014) (stating that "the broader . . . action filed . . . will provide a more effective venue for resolving this matter in its entirety").  Doing so ensures a comprehensive resolution to all of the parties' disputes.  Here, the Detroit Action is broader than the instant case.  The Detroit Action involves additional parties, including the Department of Justice ("DOJ"), HUD, and the HUD Office of Inspector General ("HUD-OIG"),

---

[1] *See United States. v. Wells Fargo Bank, N.A.*, No. 1:12-cv-07527-JMF (S.D.N.Y. Oct. 9, 2012) (complaint attached as Ex. B); *United States v. Allied Home Mortg. Capital Corp.*, No. 1:11-cv-05443-VM  (S.D.N.Y. Feb. 21, 2012) (complaint attached as Ex. C.); *United States v. Allied Home Mortg. Capital Corp.,* No. 1:11-cv-05443-VM (S.D.N.Y. Aug. 14, 2012) (order granting the unopposed motion to transfer action to the Southern District of Texas attached as Ex. D).

and their respective directing officers—none of whom are even parties to this case and as to whom Quicken Loans seeks permanent injunctive and other relief.  The Detroit Action also covers not only the question common between both cases of whether the loans at issue in the present case complied with underwriting requirements, but the defendants' procedures for reviewing loans for compliance with FHA guidelines, as well as additional facts.

*Finally*, even apart from the presumptions in favor of Michigan as the first-filed action and the broader action, the factors that courts examine under 28 U.S.C. § 1404 weigh overwhelmingly in favor of Detroit.  Most importantly, the largest number of witnesses— including, as noted above, every single person identified in the United States' Complaint—are located in Detroit.  In particular, the allegedly fraudulent conduct—the underwriting decisions, certifications, and endorsements made on the at-issue loans—occurred at Quicken Loans' offices in or near Detroit.  By contrast, the District of Columbia's connection to this case pales in comparison, including that it has no connection with the allegedly improper underwriting decisions at issue.

For all of these reasons, the Court should stay this case or transfer it to the Eastern District of Michigan, in deference to the lawsuit between the parties that is already pending in that court.

## STATEMENT OF FACTS

On April 17, 2015, Quicken Loans filed a civil action in Detroit in the U.S. District Court for the Eastern District of Michigan, against the United States, HUD, HUD-OIG, DOJ, and the respective heads of those three agencies. Ex. A ¶¶ 29-36.  That action, like this one, concerns Quicken Loans' origination and underwriting of FHA loans that were certified and endorsed for insurance between September 1, 2007 and December 31, 2011.  Since 2007, Quicken Loans has

originated over 250,000 FHA loans and is presently the highest quality lender among all large lenders based on its compare ratio (the default metric FHA uses to track default rates among FHA lenders).  *Id.* ¶¶ 1-28.  Quicken Loans underwrites FHA loans and runs its FHA program from its headquarters in Detroit, Michigan.  *Id.*

The FHA loan program is a mortgage insurance program overseen by the Federal Housing Administration, an agency within HUD.  *Id.* ¶¶ 40-49.  The FHA program is intended to expand homeownership opportunities to borrowers who otherwise would not have access to traditional forms of credit.  Throughout its history, the FHA program has been a successful one for borrowers, lenders, and HUD, and has been a bedrock lending initiative of the federal government.  *Id.*

Under the program, approved lenders can originate FHA loans in accordance with FHA's underwriting guidelines.  *Id.*  Part of the process involves a compliance certification made by Quicken Loans, which, pursuant to certain delegated authority, then endorses the loan for insurance.  *Id.*  Borrowers pay HUD a monthly insurance premium, which supports the FHA insurance fund.  *Id.*  If a loan does default, a mortgage servicer submits a claim to HUD, and HUD then pays the lender for any loss, or pays the investor for the loss if the lender sold the loan.  *Id.*  In the event that HUD has concerns that a loan was not properly underwritten, pursuant to its practices, regulations, and guidelines, HUD engages the lender in a loan-level discussion about the loan until its concerns are resolved, or the lender agrees to indemnify HUD; this process, which is how HUD has always operated and was confirmed after 2011 in the Federal Register, is referred to in the Detroit Action as the "Loan-Level Mandate".  *Id.* ¶¶ 40-49, 59.

The Detroit Action arose from HUD's abandonment of the Loan-Level Mandate. Previously, concerns that a loan should not have been insured were discussed with lenders like Quicken Loans through the agency's post-endorsement technical review process ("PETR"), typically through a letter exchange between Quicken Loans' offices in Detroit and HUD's Quality Assurance Division in either the District of Columbia or one of HUD's regional offices in Philadelphia, Atlanta, Denver or Santa Ana.  *Id.* ¶¶ 1-27.  However, in June 2013, in a letter sent to the President of Quicken Loans (in Detroit), HUD stated that as a result of an ongoing investigation by HUD, the DOJ and HUD-OIG into Quicken Loans' practices for underwriting FHA loans from 2007 through 2011, HUD was ceasing its post-closing review and loan-level discussions of any loans originated by Quicken Loans during that time period.  *Id.* ¶¶ 48-76. HUD abandoned that process even though in every prior instance where it raised a concern about a loan, Quicken Loans either resolved HUD's concern satisfactorily by discussing the issue, or agreed to indemnify HUD for any losses on that loan.  *Id.*

Consistent with its Loan-Level Mandate, HUD had never previously determined if a lender failed to comply with FHA guidelines by conducting a sampling of a lender's closed loans.  This practice was reaffirmed in July 2013 when, in connection with soliciting comments on its procedures for reviewing lenders' compliance with FHA guidelines, HUD made official statements in the Federal Register and through its conduct thereafter, that it would not use a sampling approach to determine liability for any of the loans originated prior to the date of the Federal Register notice (which necessarily includes all of the loans at issue in this action).  *Id.* ¶¶ 58-76.

However, contrary to HUD's directive that it would not engage in sampling in its review of loans, as part of the DOJ and HUD-OIG investigation (significant parts of which were

conducted in Detroit), the defendants in the Detroit Action took an adverse sample of just 116 claim loans that were originated by Quicken Loans and reviewed those loans to determine if the loans complied with FHA guidelines.  *Id.*  ¶¶ 58-95.  The defendants then extrapolated the results of that sample across the entire population of loans originated by Quicken Loans that had gone to claim, *i.e.*, they used "Conjectural Extrapolation Sampling."  *Id.*  ¶¶ 15, 58-95.  Even though the government officials found numerous "errors" in their sample that were not in fact errors, that did not affect the insurability of the loan and/or did not create a material risk to the FHA insurance fund, they nonetheless used their Conjectural Extrapolation Sampling method to demand that Quicken Loans admit to wrongdoing under the False Claims Act and pay a nine-figure settlement demand, or be subject to a lawsuit and face treble damages.  *Id.* ¶¶ 77-95.

To restore the Loan-Level Mandate, under which it had participated in the FHA program for years, and to obtain an adjudication about the quality of its loans, Quicken Loans filed the Detroit Action.  *Id.* ¶¶ 23-27.  Quicken Loans is asking the Detroit court for injunctive and declaratory relief under the Administrative Procedure Act, the contract for insurance between HUD and Quicken Loans, and the U.S. Constitution.  *Id.* ¶¶ 88-118.  Quicken Loans seeks an order from that court enjoining the defendants in the Detroit Action from using their Conjectural Extrapolation Sampling for the loans made between 2007 and 2011, enjoining the defendants from using sampling on any loans, and determining that each of the loans was properly underwritten in material respects.  *Id. ad damnum* clause.

Rather than respond to the Detroit Action and assert its claims or counterclaims in Detroit, the United States filed this action almost a week later on April 23, 2015.  In this action, the only relief that the United States seeks is monetary recovery under the False Claims Act and the federal common law based on its allegations that the FHA loans made by Quicken Loans and

certified by it for insurance between 2007 and 2011—the same loans at issue in the Detroit

Action—failed to comply with FHA underwriting guidelines.  Compl. *ad damnum* clause.  The

United States' Complaint makes numerous factual allegations regarding allegedly-improper

underwriting practices at Quicken Loans, which allegations are based largely on fragments of

emails and loans documents.  The Complaint alleges, among other things, that Quicken Loans

management and employees: made exceptions to FHA's guidelines; used inflated appraised

values; manipulated borrower data and miscalculated income; incentivized underwriters to

ignore underwriting quality; and failed to comply with FHA's requirements for quality control.

Compl. ¶¶ 98-202.  The United States' Complaint cites several examples of loans allegedly

underwritten improperly, and identifies emails and documents from ten different Quicken Loans

employees (each of whom works in Detroit) who allegedly participated in the purported

wrongful conduct.  *Id.*

In short, the central issues and facts raised in the United States' complaint are the same

central issues and facts that were already the subject of the Detroit Action.  Tellingly, all of the

individuals named in the Complaint, all of the emails and documents identified, and all of the

allegedly improper underwriting, are located or occurred in Detroit or nearby.  In contrast, just 7

of the 218 paragraphs in the United States' Complaint make threadbare allegations to support

that venue in the District of Columbia is proper.  *Id.* ¶¶ 17-24.

## ARGUMENT

### I. THIS CASE AND THE DETROIT ACTION SHOULD NOT BOTH PROCEED SIMULTANEOUSLY IN TWO SEPARATE COURTS.

"[C]onsiderations of comity and orderly administration of justice dictate that two courts

of equal authority should not hear the same case simultaneously."  *UtahAmerican Energy, Inc. v.*

*Dep't of Labor*, 685 F.3d 1118, 1124 (D.C. Cir. 2012) (citation and internal quotation marks

omitted).  This is so because "[s]ound judicial administration counsels against separate

proceedings, and the wasteful expenditure of energy and money incidental to separate litigation

of identical issues should be avoided."  *Id*. (citations and internal quotation marks omitted); *see*

*also*, *e.g.*, *Poku v. Fed. Deposit Ins. Corp.*, 752 F. Supp. 2d 23, 28 (D.D.C. 2010) ("[I]n

situations of parallel litigation in two federal district courts, the U.S. Supreme Court has stated

that 'though no precise rule has evolved, the general principle is to avoid duplicative

litigation.'") (quoting *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817,

96 S. Ct. 1236, 1246 (1976)).

In order to avoid duplicative proceedings, "[d]istrict courts have the discretion to

stay . . . a pending suit when confronted with parallel litigation of factually related cases filed in

two separate forums."  *Poku*, 752 F. Supp. 2d at 28 (citing *Handy v. Shaw*, 325 F.3d 346, 349

(D.C. Cir. 2003)).  As a further alternative to staying a duplicative case, district courts also may

elect to transfer the duplicative action to the other judicial district under 28 U.S.C. § 1404(a).[2]

*Reiffin v. Microsoft Corp.*, 104 F. Supp. 2d 48, 55–56 & n.14 (D.D.C. 2000) ("The interests of

justice are better served when a case is transferred to the district where related actions are

pending.") (citation and internal quotation marks omitted).

---

[2] Section 1404(a) empowers a court to "transfer any civil action to any other district or division
where it might have been brought," "[f]or the convenience of parties and witnesses, in the
interest of justice."  28 U.S.C. § 1404(a).  There is no question that the United States could have
filed this action (either on its own or as counterclaims) in the Eastern District of Michigan.
Under the False Claims Act, the United States may sue in any jurisdiction in which the defendant
does business or can be found.  31 U.S.C. § 3732(a) (plaintiff may bring an action under the
False Claims Act in any district in which the defendant "can be found, resides, transacts
business, or in which any act proscribed by section 3729 occurred"); *First Tenn. Bank N.A.*, 856
F. Supp. 2d at 193 (threshold test met where the federal statute permitted jurisdiction in any
district where the party resided or conducted business).  Quicken Loans is incorporated and
originates and underwrites mortgage loans in the Eastern District of Michigan.  Compl. ¶¶ 16-26;
Declaration of Amika Thornton ("Thornton Declaration") ¶¶ 5-10.

It is beyond genuine dispute that the Detroit Action and this one involve the same parties (the United States and Quicken Loans), overlap substantially as to both facts and issues, and therefore should not both proceed simultaneously in two separate federal district courts.  In the instant Complaint, the United States is seeking damages under the False Claims Act (31 U.S.C. § 3729) and common law claims for insurance payments made on FHA-insured loans that Quicken Loans originated between September 1, 2007 and December 31, 2011.  Compl. ¶ 1-2. The United States contends that a small number of those FHA loans resulted in a claim against the FHA insurance fund, and that some of those claims were wrongfully made because the loan failed to comply with FHA underwriting guidelines.  *Id.*  The United States seeks a jury trial to determine whether the underwriting decisions made on those loans, and Quicken Loans' daily operations of its FHA program in Detroit, complied with FHA guidelines, and if not, whether the insurance claims made for the loans constitute a false claim upon proof of other statutory elements, including Quicken Loans' knowledge and causation.

The Detroit Action concerns the same loans, the same facts, the same witnesses, and will ask the jury to decide the same issue of whether the loans complied with FHA guidelines (in addition to other issues).  Specifically, in the Detroit Action, Quicken Loans is seeking a declaratory judgment and injunctive relief against the United States, HUD, DOJ, HUD-OIG, and the respective heads of those agencies, regarding FHA insured loans that Quicken Loans originated between September 1, 2007 and December 31, 2011—the same loans at issue in this case.  Ex. A ¶¶ 56, 77-118, *ad damnum* clause.  Quicken Loans contends that the underwriting decisions on those loans, and the policies and practices applied by Quicken Loans in running its FHA program in Detroit, complied with FHA guidelines in material respects and that any claims

against the FHA insurance fund were not the result of improper underwriting decisions made on those loans.  *Id.*  Quicken Loans also seeks a jury trial.  *Id.*

Although the two cases have points where they differ—in comparison with this case, the Detroit Action raises additional facts and issues, seeks additional relief, and names additional parties, and in comparison with the Detroit action, this case requires proof of additional False Claims Act elements that concern the same lending conduct—the central underlying facts and issues in the instant action overlap extensively with the Detroit Action.  Both the resulting potential for wasted judicial and party resources and the "possibility of inconsistent results cannot be ignored."  *Entines v. United States*, 495 F. Supp. 2d 84, 85-86 (D.D.C. 2007).  Both cases should not proceed simultaneously.

## II.      THIS COURT SHOULD ALLOW THE EASTERN DISTRICT OF MICHIGAN TO ADDRESS FIRST WHICH COURT SHOULD RESOLVE THE PARTIES' DISPUTES.

Courts have recognized that, where overlapping cases involving the same parties are pending in separate federal courts, it makes sense to allow the Court with the first-filed case to make the initial determination whether only one forum should proceed and, if so, which forum.  *EMC Corp. v. Parallel Iron, LLC*, 914 F. Supp. 2d 125, 129 (D. Mass. 2012) ("The first-to-file rule has generally been interpreted to dictate not only which forum is appropriate, but also which forum should *decide* which forum is appropriate.  Courts in nearly every circuit have held that the court in which the second action was filed should defer to courts in the first-filed action.") (citing cases); *see, e.g.*, *Drew Techs., Inc. v. Robert Bosch, L.L.C.*, No. 11-15068, 2012 WL 314049, at *7 (E.D. Mich. Jan. 31, 2012) ("[P]rinciples of comity and judicial economy militate towards allowing [the court with the first-filed case to] decide where [the] dispute should be litigated."); *Save Power Ltd. v. Syntek Fin. Corp.*, 121 F.3d 947, 950 (5th Cir. 1997) (stating that "the court in which an action is first filed is the appropriate court to determine whether

subsequently filed cases involving substantially similar issues should proceed"); *Daimler-Chrysler Corp. v. Gen. Motors Corp.*, 133 F. Supp. 2d 1041, 1042-44 (N.D. Ohio 2001) ("I have found no case in which a court that has considered the issue has concluded that the second-filing court should—as I have been called on to do—arrogate that decision to itself.").  This simple rule is one of orderly administration and avoids the judicial waste that would otherwise arise if both courts felt compelled to decide whether overlapping disputes should proceed in one forum or two, and to then choose that forum.

Here, as already shown, the Detroit Action and this one overlap extensively.  As a result, this Court should temporarily stay this case to allow the Detroit court to first address which forum should adjudicate the parties' dispute.[3]  Deferring to the Detroit court as the first-filed forum conforms to the principles of judicial comity that "[s]ound judicial administration counsels against separate proceedings, and [that] the wasteful expenditure of energy and money incidental to separate litigation of identical issues should be avoided."  *Columbia Plaza Corp. v. Sec. Nat'l Bank*, 525 F.2d 620, 626 (D.C. Cir. 1975) (footnote omitted); *Silver Line Bldg. Prods. LLC v. J-Channel Indus. Corp.*, 12 F. Supp. 3d 320, 329 (E.D.N.Y. 2014) ("This principle of deferring to the first-filed forum comports with the basic principles of promoting judicial efficiency and avoiding duplicative litigation that underlie the first-to-file doctrine.") (citation and internal quotation marks omitted).  Deference to the Detroit court here is the sensible approach to avoid inconsistent adjudications on both the ultimate issues in the case, and on the immediate issue of where the case should proceed.  *Id.*

---

[3] Upon this Court's ordering a stay, Quicken Loans will so advise the Detroit court and ask that it decide that the parties' disputes should proceed in only one forum and that Detroit is the better forum for that resolution.

This Court should, therefore, allow the Detroit court to address first where the overlapping disputes between the parties should be adjudicated.

**III.    ALTERNATIVELY, TO ELIMINATE THE DUPLICATION, THIS COURT SHOULD TRANSFER THIS ACTION TO THE EASTERN DISTRICT OF MICHIGAN.**

If this Court decides to address the duplication of proceedings at this time, this Court should eliminate that duplication by transferring this action to the Eastern District of Michigan. This is so for three separate but mutually-reinforcing reasons:  (A) because the Detroit case was filed first; (B) because the Detroit case is broader and is the only case that can provide a comprehensive resolution of the parties' disputes; and (C) because the balance of public and private factors points overwhelmingly toward Detroit as the appropriate forum.

**A.    <u>Under The First-Filed Rule, The Detroit Action, Rather Than This One, Should Proceed.</u>**

The D.C. Circuit has explained that "[t]he usual rule in this circuit has been that where two cases . . . are commenced in two different Federal courts, the one which is commenced first is to be allowed to proceed to its conclusion first." *UtahAmerican Energy, Inc. v. Dep't of Labor*, 685 F.3d 1118, 1124 (D.C. Cir. 2012) (citations and internal quotation marks omitted); *Wash. Metro. Area Transit Auth. v. Ragonese*, 617 F.2d 828, 830 (D.C. Cir. 1980).  Numerous cases from this Court are to the same effect.  *See, e.g.*, *Furniture Brands Int'l, Inc. v. U.S. Int'l Trade Comm'n*, 804 F. Supp. 2d 1, 4 (D.D.C. 2011); *Int'l Painters & Allied Trades Indus. Pension Fund v. Painting Co.*, 569 F. Supp. 2d 113, 116 (D.D.C. 2008).  Here, the Detroit Action was filed first.  Accordingly, under the first-filed rule, the Detroit Action, rather than this one, should be allowed to proceed.

Although there is a strong presumption in favor of the first-filed action, the Court of Appeals has observed that deference to the first-filed case "is not a mandatory step in all

instances because countervailing equitable considerations, where present, cannot be ignored." *Stone & Webster, Inc. v. Ga. Power Co.*, 779 F.3d 614, 617 (D.C. Cir. 2015) (citation omitted). In this case, however, there are no "countervailing equitable considerations," much less ones sufficiently weighty to negate the first-filed rule. Indeed, the United States' filing of the present action in the District of Columbia, after Quicken Loans had already filed suit in Michigan, unquestionably reflects forum shopping.

Specifically, in a transparent effort to manufacture some connection between the parties' disputes and the District of Columbia, the United States' complaint alleges that this suit is properly venued here because FHA has its headquarters in the District of Columbia and takes some actions relative to FHA insurance here. Compl. ¶¶ 17-24. That effort fails for five reasons.

1.      This Court has previously held that the fact that a federal agency is headquartered in the District of Columbia has no material weight when choosing between judicial forums. *FHFA v. First Tenn. Bank N.A.*, 856 F. Supp. 2d 186, 192 (D.D.C. 2012) (Walton, J.) ("[T]his Court has long recognized that mere involvement on the part of federal agencies, or some federal officials who are located in Washington, D.C. is not determinative of whether the plaintiffs' choice of forum in the District of Columbia receives deference.") (citations and internal quotation marks omitted).

2.      Every single person identified in the United States' Complaint as having taken the actions resulting in the parties' disputes is located in Michigan. Thornton Decl. ¶ 19. Tellingly, the Complaint does not identify any person at FHA headquarters that the government contends took actions relevant to its lawsuit.

3.      The fact is that HUD's work in the FHA program is carried out throughout the country, not just in the District of Columbia. The program's local functions operate through four

Homeownership Centers ("HOCs") in (i) Philadelphia, Pennsylvania, (ii) Santa Ana, California, (iii) Denver, Colorado, and (iv) Atlanta, Georgia.  According to HUD's website, the "HUD Homeownership Centers insure single family FHA mortgages and oversee the selling of HUD homes."[4]  Furthermore, the FHA underwriting guidelines instruct lenders that they <u>must</u> consult HOCs regarding specific local underwriting requirements, including for example, to determine the maximum mortgage amount in a locality (HUD Handbook 4155.1 2.A.4.a), to determine if a loan can exceed the local mortgage limits (HUD Handbook 4155.1 1.A.2d.), and to determine what percentage of rental income can be used to qualify a borrower (HUD Handbook 4155.1 4.E.4.f).  And if lenders want information on claim loans, including the date of default, HUD instructs that "[l]enders should contact the [HOC] having jurisdiction over the area where the property subject to default is located for information," not FHA headquarters in the District of Columbia.  HUD Handbook 4155.1 4.A.2.g.

4.     The United States' allegations that endorsements and claims submitted for FHA loans are "processed by FHA headquarters in the District of Columbia" (Compl. ¶¶ 23-24), is undermined by the Complaint's allegations.  The Complaint alleges that the processing of endorsements and claims is done electronically and that "HUD's electronic system processes them automatically," without the need for human involvement, let alone human involvement in the District of Columbia.  Compl. ¶¶ 93-95.  The Complaint further alleges that, as a participant in the Lender Insurance Program, Quicken Loans could directly endorse loans for insurance—which it did from Detroit—without needing FHA's electronic systems in the District of Columbia to process the endorsement.  Compl. ¶¶ 40, 98.

---

[4]  FHA Connection, HUD.Gov, https://entp.hud.gov/clas/info2.cfm#hocs.

5.      When the United States filed its two similar cases against other FHA lenders, it did not file them in the District of Columbia, but instead in New York.  *United States. v. Wells Fargo Bank, N.A.,* No. 1:12-cv-07527-JMF (S.D.N.Y.) (Ex. B); *United States v. Allied Home Mortg. Capital Corp.,* No. 1:11-cv-05443-VM (S.D.N.Y.) (Ex. C).  And in the latter of those two cases, the United States consented to transferring its case to Texas where it was the defendant in a suit brought by the same lender that it sued in New York.  Ex. D; *see also supra* n.1.

That the United States is just forum shopping—and trying to stay away from Detroit—is evident from looking at what the plaintiff has done in those other, similar cases.  The complaints in those two cases made no reference to actions at the FHA's headquarters and instead were filed in New York because that was the location of the U.S. Attorney's office leading the investigations preceding those lawsuits.  In the government's press release concerning this action, it acknowledged that this investigation was a coordinated effort with the U.S. Attorney's Office in Colorado, and did not involve in anyway the U.S. Attorney for the District of Columbia.[5]  This conclusively belies any contention that the location of FHA's headquarters is of sufficient importance to outweigh the first-filed rule.

Based on the first-filed rule, therefore, this Court should stay this case or transfer it to the Eastern District of Michigan.

**B.      The Detroit Action Should Proceed Because It Is Broader And Alone Can Comprehensively Resolve The Parties' Disputes.**

Even if the first-filed rule were not dispositive, there is a preference for letting the broader case proceed when there are competing federal cases that overlap.  *DigiTrax Entm't, LLC*, 21 F. Supp. 3d at 925 ("This court agrees that the broader, coercive action filed in

---

[5]  *See* Press Release, DOJ, United States Files Lawsuit Alleging that Quicken Loans Improperly Originated and Underwrote Federal Housing Administration-Insured Mortgage Loans (Apr. 23, 2015), *available at* http://www.justice.gov/opa/pr/united-states-files-lawsuit-alleging-quicken-loans-improperly-originated-and-underwrote.

California will provide a more effective venue for resolving this matter in its entirety."); *N. Am. Airlines, Inc. v. Int'l Bhd. of Teamsters, AFL-CIO*, No. 04 Civ. 9949 (KMK), 2005 WL 646350, at *20-21 (S.D.N.Y. Mar. 21, 2005) (deferring to an overlapping federal suit because it "is more comprehensive than the one before this Court [and a]s such, the broader legal dispute between the parties is more thoroughly presented in the [other] action").  Selecting the broader of two suits to proceed with the litigation, irrespective of the order of filing, serves the interests of efficiency and sound judicial administration by ensuring all related issues can be resolved in one action, in one forum.

There is no question that the Detroit Action is broader than the action before this Court. The complaint before this Court involves two parties—Quicken Loans and the United States. The complaint asserts just four counts:  two counts under the False Claims Act and one count each for breach of fiduciary duty and negligence under the federal common law.  Compl. ¶¶ 203-218.  The central factual issue for this action is whether the FHA loans originated by Quicken Loans between 2007 and 2011 complied with FHA's underwriting requirements, and if not, whether the deviation from those guidelines was material and whether Quicken Loans knew about the deviation.  *Id.* ¶¶ 199-201.

In contrast, the complaint in the Detroit Action is broader.  The Detroit Complaint involves eight parties—Quicken Loans, the United States, HUD, HUD-OIG, DOJ, and the three respective heads of those agencies.  The Detroit Complaint asserts five counts: three counts under the Administrative Procedure Act, 5 U.S.C. § 706, a declaration and associated injunctive relief, and a Constitutional due process claim under the Fifth Amendment.  Ex. A ¶¶ 88-118. Four of those counts (Counts I, II, IV, and V) center on the same primary factual issues as in this action—whether the FHA loans originated by Quicken Loans between 2007 and 2011 comply

with FHA's underwriting guidelines, and if not, whether the deviation from those guidelines presented an undue risk to the FHA insurance fund.  *Id.*  But the Detroit Action seeks more. Four of the counts (Counts I, II, IV, and V) seek a judgment and injunctive relief to prohibit the defendants from abandoning HUD's Loan-Level Mandate or from pursuing Conjectural Extrapolation Sampling.  Four of the counts (Counts I, II, IV, and V) also seek a judgment and injunctive relief to prohibit the defendants from using the specific Conjectural Extrapolation Sampling they devised because it is unreliable, arbitrary and capricious, and would produce faulty results.  And in Count III, Quicken Loans seeks declaratory and injunctive relief to prohibit the defendants from using ***any*** sampling methodology for ***any*** set of loans originated by Quicken Loans (including the 2007-2011 loans at issue here, in addition to other loans) to demand reimbursement or indemnification.  *Id.*  ¶¶ 102-105.  Each of these additional requests for relief will require an examination of additional facts that are not at issue in this action.

Allowing the broader Detroit Action to proceed will necessarily resolve many of the lesser included issues raised in this action.  Routinely, when there are two overlapping cases and the issues and parties in one case are mostly encompassed in the other, courts will defer to the broadest of the two cases.  *See, e.g.*, *DigiTrax Entm't, LLC*, 21 F. Supp. 3d at 925 (allowing a broader action, which included all of the necessary parties, to go forward); *N. Am. Airlines, Inc.*, 2005 WL 646350, at *20-21 (allowing other action to proceed where the claims at issue in the case before the court were encompassed by the other action); *Schmitt v. JD Edwards World Solutions Co.*, No. C 01-1009 VRW, 2001 WL 590039, at *3 (N.D. Cal. May 18, 2001) (deferring to other court because more claims were asserted in another action, which "appears that [it] is the broader of the two cases"); *Budget Rent A Car Corp. v. Miljack, Inc.*, 760 F. Supp. 135, 136 (N.D. Ill. 1991) ("Here, the better alternative is to allow the Oklahoma action to

proceed.  The broader relief requested by CRLA in the Oklahoma suit would certainly address

the relief sought by Budget in this action.").  Because of the breadth of the Detroit Action and

additional parties to that lawsuit, this court should transfer this action.

 **C.**  <u>**The Other Factors Used To Choose Between Federal Forums Also Weigh**</u>
<u>**Overwhelmingly In Favor Of The Detroit Forum.**</u>

Even apart from the first-filed rule and the preference given to the more comprehensive

action, the other factors that courts examine in choosing between alternative federal forums point

heavily toward the Eastern District of Michigan.  Those include both the public interest and

private interest factors.  *Montgomery v. STG Int'l, Inc.*, 532 F. Supp. 2d 29, 32 (D.D.C. 2008).

  1.  **Private Interest Factors**

The relevant private interest factors include: (1) the plaintiff's choice of forum, (2) the

defendant's choice of forum, (3) where the claim arose, (4) the convenience of the parties, (5) the

convenience of the witnesses, and (6) the ease of access to sources of proof.  *Id.* at 32–33.

  a.  ***Plaintiff's choice of forum weighs against the District of***
***Columbia.***

As already shown above, the United States' choice to sue in the District of Columbia was

obvious forum shopping to avoid litigating the parties' disputes in Detroit, where the case should

proceed.  As such, the United States' choice of forum is entitled to no weight.  *See Schmid Labs,*

*Inc. v. Hartford Accident & Indem. Co.,* 654 F. Supp. 734, 737 (D.D.C. 1986) (transferring case

under § 1404 when plaintiffs had engaged in forum shopping); *S.E.C. v. Ernst & Young*, 775 F.

Supp. 411, 415–16 (D.D.C. 1991) (an agency's headquarters in the District of Columbia carries

no weight to choice of forum, otherwise nearly all federal enforcement actions would proceed in

the District of Columbia).

Furthermore, a plaintiff's choice of forum does not merit deference where "there is an

insubstantial factual nexus between the case and the plaintiff's chosen forum."  *New Hope Power*

*Co. v. U.S. Army Corps of Eng'rs*, 724 F. Supp. 2d 90, 95 (D.D.C. 2010).  Here, the United

States' Complaint asserts that venue is appropriate for several reasons, each of them

insubstantial.

First, HUD and the FHA (both non-parties to this suit) are headquartered in the District of

Columbia.  *See* Compl. ¶ 20-24.  However, in a variety of factual circumstances, this Court has

repeatedly declined to defer to the federal government's choice of venue in the District of

Columbia.  *See, e.g.*, *F.T.C. v. Cephalon, Inc.*, 551 F. Supp. 2d 21, 27 (D.D.C. 2008)

("[E]nforcement actions brought by the federal government in the District of Columbia may be

transferred when the case lacks any real connection to the District") (granting motion to

transfer); *S.E.C. v. Roberts*, No. 07-407(EGS), 2007 WL 2007504, at *3 (D.D.C. July 10, 2007)

(granting motion to transfer where only connection to the District of Columbia is the formal

filing of SEC forms); *First Tenn. Bank N.A.*, 856 F. Supp. 2d at 192-93 (granting motion to

transfer and finding that the mere involvement of a federal agency was not sufficient to

overcome the lack of other factual nexus between the action and the District of Columbia).

Second, the Complaint asserts that the "process[ing]" of the FHA insurance endorsement

and insurance claims occurs in the District of Columbia, as a reason to find venue proper here.

Compl. ¶¶ 19-24.  Yet, the ministerial "automatic" processing of loans for endorsement and

claims by FHA's "electronic system[s]" creates no "factual nexus" to this district.  *Id.* ¶¶ 93-95.

*See S. Utah Wilderness Alliance v. Lewis*, 845 F. Supp. 2d 231, 235 (D.D.C. 2012) (transferring

action because beyond an agency's headquarters, there must be "some substantial personalized

involvement by a member of the Washington, D.C. agency") (internal quotations omitted); *U.S.

ex rel. Ondis v. City of Woonsocket*, 480 F. Supp. 2d 434, 463 (D. Mass. 2007) (district where

HUD received allegedly false claims not entitled to deference where underlying events occurred

in transferee forum).  The fact that the FHA's computer systems are housed in the District of

Columbia has almost no connection to the relevant events.  Any claim information on those

computer systems can be obtained from HUD's regional HOCs (HUD Handbook 4155.1

4.A.2.g.) and likely anywhere where there is a HUD computer terminal, and those systems have

nothing to do with the underwriting of loans at issue in this action.  Regardless, the allegations

are insubstantial.  The Complaint elsewhere alleges that Quicken Loans *did not* submit any loans

for endorsement to FHA because it had authority under the Lender Insurance Program to endorse

loans *directly itself*, which it did from Detroit.  Compl. ¶¶ 40, 98.  The Complaint also does not

even allege that Quicken Loans submitted claims for payment (because it is typically the servicer

of the loan, not the lender, that submits a claim for payment).

Third, the Complaint also asserts that Quicken Loans underwrote and endorsed 134 FHA

loans between 2007 and 2011 where the property securing the loan was located in the District of

Columbia.  Compl. ¶ 19.  Whatever the significance of the geographical location of the

mortgaged property, the Court need not tarry long in considering the United States point on this

score.  During that same time period, Quicken Loans originated 8,038 FHA loans where the

property securing the loan was located in the State of Michigan.  Furthermore, as the United

States acknowledges (*id.*), only three of the District of Columbia loans became claim loans and

could even be subject to a False Claims Act claim, and this is out of the "hundreds" of claim

loans purportedly at issue. Compl. ¶ 101.

Notably absent from the United States' pleading is any suggestion that venue is proper

because many HUD or other government witnesses and Quicken Loans witnesses are in this

district.  While it is certainly the case that some HUD and other government witnesses located

here will have relevant and discoverable evidence, the United States concedes by its silence that the balance of witness convenience and access weighs heavily in favor of proceeding in Detroit.

In short, the United States' chosen venue has insufficient "real connection" to this litigation and its contention otherwise is betrayed by its own pleading.  Therefore, the United States' choice of venue is not entitled to any deference.  As this Court has held, where the plaintiff's choice of forum is the sole private interest factor supporting venue in the District of Columbia, and the remaining factors favor the defendant's forum of choice, the defendant's choice should prevail.  *See McClamrock v. Eli Lilly & Co.*, 267 F. Supp. 2d 33, 37 (D.D.C. 2003) (Walton, J.).

> b. ***Quicken Loans' preference for Detroit favors transferring this action.***

By contrast, Quicken Loans' chosen venue—the Eastern District of Michigan—has a direct and strong connection to this litigation, and hence Quicken Loans' choice is entitled to substantial weight.  All of the remaining private interest factors concerning convenience of the forum—where the claims arose; the convenience of the parties; the convenience of the witnesses; and the ease of access to sources of proof—weigh in favor of the Eastern District of Michigan. Quicken Loans is headquartered in Detroit (Compl. ¶ 26); the allegedly non-compliant or fraudulent conduct, including the underwriting decisions and management decisionmaking, all occurred in Michigan (*see* Thornton Decl. ¶¶ 9-10); the claims at issue arose in Michigan (*see infra*); Detroit is a convenient forum for both Quicken Loans and the United States (*see infra*); all of the individuals cited in the Complaint work in Detroit, as do nearly all of the Quicken Loans employees that could be potential witnesses (Thornton Decl. ¶¶ 5-20); and all of the loan files, emails, and other documents cited in the Complaint are kept in Detroit (Thornton Decl.

¶¶ 21-22).  When these other factors support the transferee forum, this Court frequently defers to

the defendant's choice of forum.  *McClamrock*, 267 F. Supp. 2d at 37.

c.   <strong><em>The Government's claims arose in Michigan.</em></strong>

For purposes of Section 1404(a), claims arise "in the location where the corporate

decisions underlying those claims were made, or where most of the significant events giving rise

to the claims occurred."  *F.T.C. v. Graco Inc.*, No. 11-cv-02239, 2012 WL 3584683, at *5

(D.D.C. Jan. 26, 2012) (citation omitted); *U.S. ex rel. Ondis v. City of Woonsocket*, 480 F. Supp.

2d 434, 463 (D. Mass. 2007) (transferring False Claims Act case to Rhode Island where "[a]ll

events except the receipt of the allegedly false claims [by HUD] occurred in Rhode Island").

Here, all of the facts that the government alleges gave rise to its claims occurred in Michigan:

- The Complaint alleges that there are thousands of claim loans that may be subject to liability under the False Claims Act (Compl. ¶¶ 98-102); all of those loans were underwritten in Michigan (Thornton Decl. ¶ 9).

- Pursuant to HUD's regulations (24 C.F.R. § 203.257), a contract for insurance is created between HUD and the lender at the time of endorsement of a loan for FHA insurance; according to the allegations in the complaint, Quicken Loans, as a participant in the Lender Insurance Program, endorsed each FHA loan at issue for insurance, and thereby created the contract between itself and HUD (Compl. ¶¶ 40, 98), from Michigan (Thornton Decl. ¶ 10).

- The Complaint alleges that Quicken Loans executives made false annual certifications regarding its compliance with FHA requirements (Compl. ¶¶ 103-106); each of those certifications was made in Michigan (Thornton Decl. ¶ 20).

- The Complaint alleges that Quicken Loans' management approved exceptions to FHA guidelines (Compl. ¶¶ 114-127); nearly all of Quicken Loans' management responsible for the FHA program are located in Detroit (Thornton Decl. ¶ 7).

- The Complaint alleges that a team of employees made "value appeals" to obtain allegedly inflated appraisal (Compl. ¶¶ 128-143); nearly all of the team responsible for reviewing appraisals is in Detroit (Thornton Decl. ¶ 6).

- The Complaint alleges that employees and management manipulated and miscalculated borrower income (Compl. ¶¶ 144-155); nearly all of the underwriters and management responsible for calculating income and underwriting FHA loans are in Detroit (Thornton Decl. ¶¶ 5, 7).

- The Complaint alleges that underwriters were compensated in a way to encourage quantity over quality (Compl. ¶¶ 156-165); the management and decisionmakers responsible for determining underwriting compensation are in Detroit (Thornton Decl. ¶ 13).

- The Complaint alleges that underwriters manipulated data and ignored red flags in the course of underwriting FHA loans (Compl. ¶¶ 166-178); nearly all FHA underwriters and management responsible for those underwriters are located in Detroit (Thornton Decl. ¶¶ 5, 7).

- The Complaint alleges that Quicken Loans' quality control team failed to report and adequately assess compliance with FHA guidelines (Compl. ¶¶ 179-198); the entire quality control team is located in Detroit (Thornton Decl. ¶ 8).

- The Complaint cites numerous emails and documents throughout and attributes authorship of those emails and documents to ten specific Quicken Loans executives or employees; each of those individuals works at a Quicken Loans office in Detroit (Thornton Decl. ¶ 19).

Under these circumstances, a False Claims Act claim arises in the state where defendant allegedly perpetrates the scheme to defraud the government. *U.S. ex rel. Holbrook v. Brinks Co.*, No. 11-4732, 2013 WL 4731545, at *4 (D.N.J. Sept. 3, 2013); *U.S. ex rel. Bukh v. Guldmann, Inc.*, No. 11-C-3701, 2014 WL 1647148, at *10–11 (E.D. Ill. Apr. 24, 2014) (transferring FCA action to forum where defendant's corporate headquarters was located because that was where the business decisions were made regarding the transactions that allegedly violated the FCA, and where evidence relevant to FCA elements was located).  Here, that state is Michigan.

Finally, the United States' lawsuit was preceded by a nearly three-year investigation into Quicken Loans that involved the depositions or interviews of nine Quicken Loans executives or employees, and the production of over 85,000 documents.  Ex. A ¶¶ 55-56.  Each of those nine individuals is located in Detroit, each of the depositions or interviews took place in Detroit, and all of the documents were produced from Detroit.  Thornton Decl. ¶¶ 17-18.  The claims asserted here grew from that investigation, the facts of which arose in Detroit and favor Detroit as the best forum.  *Roberts*, 2007 WL 2007504, at *3 (transfer proper where underlying acts including

defendants' internal investigation occurred at defendant's headquarters in the transferee forum, and only event to occur in the District of Columbia was the filing of SEC forms).

d.  ***Detroit is the more convenient forum for the parties.***

Detroit is a convenient forum for all of the parties to litigate this action.  Although the United States has asserted that HUD and the FHA program are headquartered in the District of Columbia, the United States cannot reasonably contend that any inconvenience to the government in litigating this matter in Detroit is sufficient to justify proceeding in the District of Columbia.

Moreover, although the FHA program is headquartered in the District of Columbia, many decisions that affect the FHA program and underwriting requirements that pertain to this lawsuit, were made at HUD's four HOCs located around the country.[6]  Furthermore, any "minor litigational inconveniences" experienced by HUD and FHA as federal agencies litigating outside of the District of Columbia are present in virtually every investigation and litigation conducted by those agencies outside the District—and yet, these agencies regularly engage in such investigations and litigation around the country.  *Ernst & Young*, 775 F. Supp. at 415–16.  In fact, the United States commenced two similar False Claims Act actions concerning FHA loans in the Southern District of New York.  *See supra* n.1.  If the mere location of an agency's headquarters in the District of Columbia was sufficient to preclude a transfer of venue to an otherwise convenient forum, this Court would be "inundated with every enforcement action, regardless of where the underlying events took place."  *Ernst & Young*, 775 F. Supp. at 415.

In addition, the United States has already demonstrated that litigation in Detroit would not be particularly inconvenient because it conducted a substantial portion of its investigation,

---

[6]  *See* FHA Homeownership Centers, HUD.Gov, http://portal.hud.gov/hudportal/HUD?src=/program_offices/housing/sfh/sfhhocs).

including all interviews and depositions, in Detroit.  Thornton Decl. ¶ 17.  Detroit is a convenient

forum for the United States, and obviously for Quicken Loans given that it is headquartered there

and nearly all of its 11,000 employees are in Detroit (Ex. A ¶ 7).  Transferring this action to

Detroit would promote access to the underlying facts, witnesses and evidence, and facilitate the

efficient litigation of both this action and the Detroit Action.

   e.  ***Detroit is more convenient for the witnesses.***

  The convenience of the witnesses supports transferring this action to Detroit.  As this

Court has held, "[t]he most critical factor to examine under 28 U.S.C. § 1404(a) is the

convenience of the witnesses."  *Chung v. Chrysler Corp.*, 903 F. Supp. 160, 164 (D.D.C. 1995).

This factor deserves particular weight where the witness testimony will be critical to "fiercely

contest[ed]" issues.  *See Comptroller of Currency v. Calhoun First Nat'l Bank*, 626 F. Supp. 137,

140–41 (D.D.C. 1985) (convenience of witnesses was an important factor where case would

require testimony of individuals on both sides of contested loan transactions).  Courts

consistently transfer actions when the majority of witnesses live in or near the transferee forum.

*Pyrocap Int'l Corp. v. Ford Motor Co.*, 259 F. Supp. 2d 92, 98 (D.D.C. 2003); *see, e.g.*, *Roberts*,

2007 WL 2007504, at *4 (transferring case where defendant identified 14 witnesses in transferee

forum and plaintiff identified no witnesses in District of Columbia); *Ernst & Young*, 775 F.

Supp. at 414-15 (transferring case where majority of fact witnesses resided in transferee forum,

and federal agency personnel would demonstrably not be inconvenienced, as they had

investigated defendant there); *S.E.C. v. Page Airways, Inc.*, 464 F. Supp. 461, 464 (D.D.C. 1978)

(transferring case where 25 of 64 of the defendant's witnesses resided in transferee forum;

defendant's remaining witnesses were equal distance from District of Columbia and transferee

forum; and most of the plaintiff's witnesses were government employees that could be expected

to be produced at trial in either forum).

Here, all of the witnesses that are employees of Quicken Loans that may be called to testify at trial or sit for a deposition are located in Detroit, and most of the third-party witnesses (such as borrowers and appraisers) potentially necessary for trial are ***not*** located in or near the District of Columbia.  Significantly, each of the ten Quicken Loans employees named in the United States' Complaint is located in Detroit.  Thornton Decl. ¶ 19.  The convenience of these witnesses should be given great weight in this case because they are directly named in the Complaint and are alleged to have been involved in the contested underwriting decisions.  Additionally, nearly all other Quicken Loans employees that will be necessary witnesses for the government to meet its burden of proof on its claims, and for Quicken Loans to rebut those claims, are in Detroit.  This includes all or nearly all of Quicken Loans' executives and officers (*id.* ¶ 16), initial underwriters (*see id.* ¶ 5), final sign-off underwriters (*see id.* ¶ 5), quality control analysts (*id.* ¶ 8), appraisal team underwriters (*id.* ¶ 6), quality assurance and compliance personnel (*id.* ¶ 11), the FHA program manager and liaison to HUD and to the regional HOCs (*id.* ¶ 14), personnel responsible for training underwriters on FHA loans (*id.* ¶ 15), and those responsible for making annual certifications to HUD regarding Quicken Loans' compliance with the FHA program (*id.* ¶ 20).

In contrast, few potential third-party witnesses are likely located in the District of Columbia.  The government's complaint identifies ten specific claim loans and makes allegations about statements made by the borrowers of those loans, and the value opinions by the appraisers that appraised the properties for those loans.  Compl. ¶¶ 125-26, 139-42, 149-50, 173-74.  The testimony of those third parties is necessary for the government to prove, and Quicken Loans to rebut, its claims.  However, as the government alleges, Quicken Loans made only 134 FHA loans secured by properties located in the District of Columbia from 2007 to 2011.  Compl. ¶ 19.

In comparison, Quicken Loans made over 60 times that number of loans in the state of Michigan (8,083 FHA loans).  Thornton Decl. ¶¶ 23.  The government also admits that only three of the claim loans that could serve as a basis for recovery under the False Claims Act are located in the District of Columbia—out of an alleged "hundreds" of claim loans it puts at issue.  In contrast, of just the ten claim loans the United States exemplifies in its Complaint, two concern properties and borrowers located in Michigan.  Compl. ¶¶ 139, 141.

Further, although some governmental employees with relevant evidence are located in the District of Columbia, other HUD and FHA witnesses are located throughout the country at local HOCs.  Regardless, those federal agencies have already demonstrated their amenability to proceedings in Detroit by investigating Quicken Loans in that state and having HUD attorneys attend depositions and interviews in Detroit.  *See Ernst & Young*, 775 F. Supp. at 415.

This critical factor weighs heavily in favor of transfer to Michigan.

### f.       *Access to the evidence supports a transfer to Detroit.*

The last convenience factor—access to proof—supports transferring this action to Detroit.  It is well-established that transfer is appropriate where most or all evidence is located in the transferee forum.  *See, e.g.*, *Roberts*, 2007 WL 2007504, at *4 (granting transfer where the only evidence located in the District of Columbia was the SEC's investigative file); *Ernst & Young*, 775 F. Supp. at 414-15 (granting transfer of SEC claims regarding defendant's audits of Texas-based companies where evidence of loans made by the companies, the companies' lending practices, and the property leased by the companies was all in Texas); *Page Airways Inc.*, 464 F. Supp. at 464 (granting transfer of SEC claims where all evidence of the relevant company's marketing and sales practices, accounting, bank accounts, and audits was located in transferee

state).[7]   As discussed above, the bulk of the relevant evidence is in Detroit, including  all of the

loan files for the claim loans at issue, and all of Quicken Loans' emails and documents that will

be necessary to rebut the government's false claims.

In sum, each private interest factor heavily weighs in favor of transferring this action to

Detroit.

### 2.   Public Interest Factors

Not only would transfer of this action to Detroit promote the convenience of the parties

and the witnesses, but it would also facilitate the public interest in justice.  Factors relevant to the

public interest include: (1) the transferee court's familiarity with the governing laws, (2) the

relative congestion of each court, and (3) the local interest in deciding local controversies at

home.  *Montgomery*, 532 F. Supp. 2d at 34.

The first factor—familiarity with the governing law—is neutral because this action arises

under the False Claims Act, and all federal courts are presumed equally competent to decide

questions of federal law.  *First Tenn. Bank N.A.*, 856 F. Supp. 2d at 194.

The second factor regarding the relative congestion of the Eastern District of Michigan

and this Court favors transferring this action to Detroit.  Determining the relative congestion of

two courts is examined by comparing both court's median filing-to-disposition or filing-to-trial

period.  *Pueblo v. Nat'l Indian Gaming Comm'n*, 731 F. Supp. 2d 36, 40 n.2 (D.D.C. 2010).

According to the most recent statistics regarding federal judicial caseloads, the median filing-to-

trial period was 49.7 months in the District for the District of Columbia, and only 29.3 months in

the Eastern District of Michigan, and the median filing-to-disposition period was 7.6 months in

---

[7] This remains true even if most of the evidence is available in electronic form.  "[T]echnological
advances do not obviate the access to evidence inquiry entirely," and the location of the original
documents or evidence will weigh in favor of the district where the movant is headquartered.
*F.T.C. v. Graco Inc.*, No. 11-cv-02239, 2012 WL 3584683, at *6 (D.D.C. Jan. 26, 2012).

the District of Columbia and 8.8 months in Detroit.[8]  Although the difference between the filing-

to-disposition periods is insignificant, the filing-to-trial period in Detroit is substantially shorter.[9]

The filing-to-trial period is also the better measure here because there is no reason to expect the

disputes between the parties to be resolved soon, let alone before trial.  *See Virts v. Prudential*

*Life Ins. Co. of Am.* 950 F. Supp. 2d 101, 108 (D.D.C. 2013) (noting that if the case proceeds to

trial, parties will experience the filing-to-trial delay); *cf. Pueblo*, 731 F. Supp. 2d at 40 n.2

(filing-to-disposition relevant measure for an APA case that was unlikely to go to trial); *Holland*

*v. ACL Transp. Servs. LLC*, 815 F. Supp. 2d 46, 59 (D.D.C. 2011) (filing-to-disposition relevant

measure for type of case that was historically resolved by summary judgment).  The facts at issue

concerns thousands of loans and potentially hundreds of witnesses, and after nearly three years

of investigation and months of settlement discussions, the parties remain irreparably apart.  It

would be naïve to expect a quick resolution to this dispute.  Indeed, the two similar False Claims

Act suits brought by the government against FHA lenders are both in their third year of

litigation.  *See supra* n.1.

　　　　The third factor regarding Detroit's local interest in this matter also weighs in favor of a

transfer.  Federal courts have an interest in seeing local controversies "resolved in the locale

where they arise."  *Graco Inc.*, 2012 WL 3584683, at *6 (citation and internal quotation marks

omitted).  As discussed above, the factual allegations, most witnesses, and documents all arose or

reside in Michigan.  The fact that the government's cause of action arises under federal law does

---

[8] United States District Courts—National Judicial Caseload Profile, U.S. COURTS (Dec. 2014), *available at* http://www.uscourts.gov/Statistics/FederalCourtManagementStatistics/district-courts-december-2014.aspx.

[9] Transferring this action now is unlikely to contribute further to that congestion because at this early stage of the litigation, any delay would be minimal.  *Taylor v. Shinseki*, 13 F. Supp. 3d 81, 91 (D.D.C. 2014) (holding that for the congestion factor, if a party moves to transfer "'earlier in the litigation process, more of the equities would tilt to transfer.'") (citation omitted).

not affect the analysis—it remains a local controversy in Detroit because the majority of the operative facts occurred there and the "case will directly affect the lives of Michigan residents." *Bergmann v. U.S. Dep't of Transp.*, 710 F. Supp. 2d 65, 75 (D.D.C. 2010) ("[T]he fact that plaintiff's cause of action arises under federal law does not mean that the subject of his lawsuit does not present an issue of local controversy.  To the contrary, there can be no doubt that the projects at issue in this case will directly affect the lives of Michigan residents.").  Michigan has a substantial interest in adjudicating a controversy that arose there and that concerns disputes between a Michigan company and the federal government.

In sum, even apart from the first-filed rule and the preference for the broader action, both the private and public interest factors powerfully favor the Eastern District of Michigan as the forum to resolve the parties' disputes.

## CONCLUSION

For the foregoing reasons, Quicken Loans respectfully requests that the Court stay this case in order to allow the Eastern District of Michigan to opine on the appropriate forum to address the parties' dispute, or in the alternative to transfer this action to the Eastern District of Michigan.

Dated:        April 29, 2015

Respectfully submitted,

QUICKEN LOANS INC.

By its attorneys,

31

<u>/s/Jeffrey B. Morganroth</u>
Jeffrey B. Morganroth
**MORGANROTH &**
**MORGANROTH, PLLC**
344 North Old Woodward Avenue
Suite 200
Birmingham, MI 48009
Tel.:  248.864.4000
Fax.:  248.864.4001
jmorganroth@morganrothlaw.com
D.C. Bar No. 421684


Thomas M. Hefferon
**GOODWIN PROCTER LLP**
901 New York Avenue, NW
Washington, DC  20001
Tel.:  202.346.4000
Fax.:  202.346.4444
thefferon@goodwinprocter.com
D.C. Bar No. 461750

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 29, 2015, a copy of Quicken Loans Inc.'s Memorandum in Support of its Motion to Stay or Transfer in Light of a First-Filed Action Pending in the Eastern District of Michigan was served by electronic means via the Court's CM/ECF System on all counsel registered to receive electronic notices.

<u>/s/Jeffrey B. Morganroth</u>
Jeffrey B. Morganroth