# Exhibit A

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

QUICKEN LOANS INC.,

        Plaintiff,

   v.

UNITED STATES OF AMERICA;
UNITED STATES DEPARTMENT
OF HOUSING AND URBAN
DEVELOPMENT; JULIÁN CASTRO,
in his official capacity as Secretary of
the United States Department of
Housing and Urban Development;
UNITED STATES DEPARTMENT
OF HOUSING AND URBAN
DEVELOPMENT OFFICE OF
INSPECTOR GENERAL; DAVID A.
MONTOYA, in his official capacity as
Inspector General for the United States
Department of Housing and Urban
Development; UNITED STATES
DEPARTMENT OF JUSTICE; and
ERIC H. HOLDER JR., in his official
capacity as Attorney General of the
United States Department of Justice,

        Defendants.

Civil Action No.:
Hon.:

**COMPLAINT**

**JURY TRIAL DEMANDED**

## INTRODUCTION

1.      Quicken Loans Inc. ("Quicken Loans"), is the largest lender of Federal Housing Administration (FHA) insured loans in the United States today. In addition, by the FHA's own published reporting, Quicken Loans has the lowest default rate (and the highest quality loans in the country today.  Quicken Loans has built a reputation as the 'gold standard' for the quality of its loans in both government lending (FHA and VA), as well as conventional lending and it has also led the industry in customer service as evidenced by the company being named the top JD Power and Associates lender for mortgage origination satisfaction over the past five consecutive years.  In 2014, JD Powers and Associates named Quicken Loans the top primary mortgage servicer as well.

2.      In light of its recent history as a key participant in the FHA program, Quicken Loans was surprised when, nearly three years ago, the United States Department of Justice ("DOJ") and the HUD Office of Inspector General ("HUD-OIG") notified Quicken Loans that it was launching an investigation into the lending practices of the company.  As shocking as this was to the company, the DOJ and HUD-OIG assured Quicken Loans that the investigation was based on the size of the company's FHA lending.  In other words, the DOJ informed the company that it was investigating all of the largest FHA lenders in the United States, rather than investigating Quicken Loans because it suspected wrongdoing.

1

3.      Through Quicken Loans' participation in the FHA program, the FHA (which is part of the U.S. Department of Housing and Urban Development or "HUD") is projected to receive over $5.7 billion in net profits (premiums collected above and beyond claims paid) for FHA loans made in 2007-2013.

4.      Because of the company's nationally recognized track record for the performance of its loans (by the FHA's own objective public reporting), the company was not significantly concerned by the DOJ inquiry.  Clearly, any investigation into the company's lending practices and track record would objectively prove not only that there was no 'fraud' or anything close to 'systematic failure' in the company's FHA lending policies, procedures, underwriting and closing processes, but also that Quicken Loans was the premier example of quality in the entire home lending industry.

5.      Unfortunately, Quicken Loans' confidence that facts, reason and justice would prevail was misplaced.  Quicken Loans appears to be one of the targets (due to its large size) of a political agenda under which the DOJ is "investigating" and pressuring large, high-profile lenders into paying nine- and ten-figure sums and publicly 'admitting' wrongdoing, including conceding that the lenders had made 'false claims' and violated the False Claims Act.

6.      Over the past three years, the DOJ has subpoenaed over 85,000 documents and emails and conducted lengthy depositions of numerous Quicken

2

Loans leaders.  The DOJ has also repeatedly threatened a high profile lawsuit

against the company unless the company both (a) pays a multiple of hypothetical

losses (based only on a skewed, cherry-picked, and unrepresentative sampling of 55

FHA loans out of more than 246,000 FHA loans closed by the company) incurred

by the FHA for loans that Quicken Loans originated in good faith and that were in

compliance with FHA guidelines, and (b) publicly 'admit' that its lending practices

were significantly flawed and publicly state that it had violated the False Claims Act

(in essence, admit that it committed fraud that the company did not commit).

According to the DOJ and HUD-OIG, a lawsuit against the company will be filed if

Quicken Loans does not acquiesce to their demands.

7.     Quicken Loans was founded close to 30 years ago and has

painstakingly built a nationally recognized reputation for outstanding loan quality

and exemplary customer service.  It has consistently avoided questionable lending

practices and therefore the ramifications and consequences experienced by

numerous lenders, both large and small, who participated in questionable types of

lending.  The company and its more than 11,000 employees, the vast majority of

whom work out of rehabilitated office buildings in downtown Detroit, take pride in

their honest and reputable lending practices and the company's highly acclaimed

customer service.

8.     Quicken Loans has been an FHA-approved lender for nearly 27 years and began significantly focusing growing its FHA business in 2007.  Today, Quicken Loans originates more FHA loans than any other lender in the country, and does so with the highest degree of quality among all large FHA lenders based on FHA's own objective, publicly issued metrics.  Through Quicken Loans' participation in the FHA program, the insurance fund is projected to receive over $5.7 billion in premiums (after accounting for claims paid) just for loans made in 2007-2013.

9.     Under HUD's own evaluation of all FHA lenders, the quality of loans originated by Quicken Loans today is more than twice as good as the national average, and the best among all large FHA lenders.  Compared to a hypothetical lender producing average quality loans, Quicken Loans has saved the FHA insurance fund more than $250 million in payments on claims already paid, and that savings is projected to be $1 billion or greater than the average FHA lender. Again, FHA's insurance fund is projected to net over $5.7 billion in profits from insurance premiums net of claims in total on Quicken Loans' FHA mortgages. Without the quality loans underwritten by Quicken Loans through the FHA program (and the payment of the corresponding FHA insurance premiums), it is unlikely that the FHA's mutual mortgage insurance fund would have returned to profitability as soon as it did in November 2014.

10.     HUD has sought input from Quicken Loans in the past for recommendations on improving the FHA loan program.  Quicken Loans has developed a strong and productive relationship with each of the local HUD Homeownership Centers responsible for administering the FHA program.  HUD officials have visited Quicken Loans' offices, and Quicken Loans has visited HUD's local offices, and from all indications, HUD has always approved of Quicken Loans' approach to FHA lending, particularly in light of Quicken Loans' high credit quality.

11.     Quicken Loans has always stood behind its highest loan quality, but where a relatively small amount of errors were made, and where those mistakes presented a material risk of loss to the FHA fund attributable to Quicken Loans' errors, Quicken Loans has cooperated with the FHA to resolve those issues through the FHA's normal, well-established process.  In fact, for loans made from 2007 to 2011, Quicken Loans has voluntarily agreed to indemnify the FHA for 56 loans (which is 0.02% of all FHA loans made by Quicken Loans or one indemnification for every 4,393 loans closed) as a result of this course of practice, all without the threat of a lawsuit.

12.     Yet, at the apparent directive of the DOJ and HUD-OIG, HUD now has abruptly changed the rules retroactively and abandoned that long-established, cooperative approach and its established process for retrospective evaluation of

previously-originated loans.  This has happened in the context of an investigation of Quicken Loans which started three years ago without fanfare and has grown as Defendants have seen a number of other lenders pay nine- and ten-figure sums to "settle" disputes over FHA loans.  The DOJ and HUD-OIG's sudden hijacking of Quicken Loans' relationship with HUD, and HUD's abandonment of its normal and well-established processes, was arbitrary and capricious, contrary to law and inconsistent with the parties' contracts, leaving Quicken Loans with no choice but to seek relief from this Court.

13.     Defendants have acted unlawfully in their retroactive change of process for evaluating loans.  Specifically, pursuant to the applicable HUD regulations, the contract between HUD and the mortgage lender covering each insured loan, and agency policy, HUD's practice for evaluating loan quality has long been to assess on an individual basis whether a loan was properly underwritten or in compliance with program rules.  That practice recognizes that loan origination is an individualized process and that the retrospective review of how a loan was originated requires the raising and answering of questions as to loan-related circumstances, such as a borrower's individual situation, the unique nature of each property, and the specific underwriting guidelines in effect at the time.  If HUD sometimes determines that a loan was not originated properly and, as agreed by the parties, contemplated by FHA regulations, and under the terms of

the agreement between HUD and the lender, HUD obtains indemnification from the lender for the possibility of a future claim for a loan default.

14.     This is in fact how HUD has always resolved disputes regarding FHA loans originated by Quicken Loans and all other FHA lenders.  That is, until recently.  HUD informed Quicken Loans that, because of the DOJ and HUD-OIG investigation under the False Claims Act, it would no longer evaluate individual loan liability discussions with Quicken Loans to resolve issues of loan origination for any FHA loan originated between 2007 and 2011.  Under apparent pressure and/or direction from the DOJ and HUD-OIG, HUD abdicated its role in the FHA program and its practice to evaluate whether any FHA loan was made in accordance with the applicable guidelines, and, if not, whether to seek indemnification from Quicken Loans.

15.     Instead, the DOJ and HUD-OIG have asserted that they (on behalf of HUD) will determine the extent to which loans made between 2007 and 2011 were not originated in accordance with the applicable guidelines.  Furthermore, although HUD had expressly stated in a Federal Register notice in 2013 that it does not and will not use sampling as a basis to demand reimbursements from any FHA lender, the DOJ and HUD-OIG have notified Quicken Loans that this is precisely how FHA will audit and evaluate Quicken Loans' liability on FHA-insured loans.  According to the DOJ and HUD-OIG, based upon "Conjectural Extrapolation

Sampling" (i.e., speculatively assuming that any supposed defects in a biased,
cherry-picked, miniscule subset of loans (here, 55 out of more than 246,000 FHA
loans) will exist to the same extent in a large loan population over a lengthy period
of time and then extrapolating such supposed defects on the same percentage basis
across the entire loan population without using any objective or acceptable
methodology or criteria), they have hypothesized that a large percentage of  FHA
loans made by Quicken Loans consist of supposed defects and are therefore subject
to treble damages and statutory penalties.  They applied this illegitimate
methodology even though the situation of each individual borrower and the
mortgaged property are unique and all FHA lenders are required to keep detailed
records on how the FHA loan was underwritten and made, which is accessible to
HUD.

16.     Not only have the Defendants impermissibly retroactively changed the
review process, but the Conjectural Extrapolation Sampling they then engaged in is
biased, unreliable and riddled with error.  The DOJ and HUD-OIG have cited
numerous examples to Quicken Loans where they believed a loan in the sample
failed to comply with a single FHA guideline, and was therefore a false claim,
giving no apparent consideration to whether the suspected defect was material to
the overall credit risk of the loan or caused the default, and regardless of whether
their finding was legitimate and supportable or even accurate.

17.     For example, the DOJ and HUD-OIG claim that Quicken Loans made a false claim within the meaning of 31 U.S.C. § 3729 (that is, knowingly making a false and material claim for money to the government that caused a loss), where a single immaterial document in the loan file was missing, where Quicken Loans purportedly miscalculated a borrower's income by as little as $17, and where Quicken Loans was alleged to have loaned a borrower $26 too much on a $99,500 loan.  Characterizing such "transgressions" as false claims upon which any damages should be owed (let alone treble damages) is inconsistent with common sense, basic principles of fairness, and the FHA's prior practices and procedures.

18.     Not only did Defendants err in their hypothesis as to the loans that they used for their Conjectural Extrapolation Sampling, but their method of selecting those loans as a "sample" to be extrapolated was neither objective nor reasonable.  The loans were cherry-picked, and not representative of Quicken Loans' overall performance as a high-quality FHA lender.  The miniscule 55 loans DOJ and HUD-OIG have based their demands on were only loans where the borrowers defaulted and a claim was made, but ignores the hundreds of thousands of loans for which there were no problems.  And the "sample" was statistically too small, even under HUD methodologies for how samples are taken (when sampling is used by HUD under other circumstances).

19.     After proffering their false and illegitimate accusations of underwriting defects and asserting that such defects constituted false claims based on improper extrapolation of a miniscule, cherry-picked sample, the DOJ and HUD-OIG demanded that Quicken Loans make a nonsensical payment of a multiple of the amount of HUD's hypothetical losses, plus falsely admit to wrongdoing, that Quicken Loans did not commit, in a public statement of facts. Making matters worse, DOJ and HUD-OIG then started threatening Quicken Loans that they will file a False Claims Act lawsuit based upon the false, arbitrary and capricious accusations unless Quicken Loans acquiesced to their illegitimate demands.  HUD representatives attended those meetings and thereby joined in those demands (and in the actions underlying those demands), despite FHA's obvious satisfaction with Quicken Loans as a strong business partner and their overall top-quality lender.

20.     HUD's long-standing approach of evaluating loan compliance on an individualized basis, utilizing discussions of any identified issues and then seeking indemnification for actual losses, is central to the continued success of the FHA program.  Proceeding on any other basis, which would result in false findings of underwriting non-compliance and punitive treble penalties, would destroy the business relationship and daily interaction between HUD and its lenders, and

would thereby severely harm the FHA program, significantly damaging access to credit for middle-class Americans who rely on the FHA program.

21.     But harming the FHA program is exactly what Defendants are doing. Defendants' actions of treating any suspected non-compliance with FHA guidelines as a false claim, using illegitimate Conjectural Extrapolation Sampling, and seeking a multiple of hypothetical damages based on extrapolation and not the facts of each individual loan, combined with the DOJ's and HUD-OIG's threats and tactics of intimidation unrelated to the merits of their accusations, is likely to damage the entire FHA program.  Other lenders have questioned publicly whether it is sensible and too risky to continue to be a business partner in the FHA program if the government is permitted to retroactively change the rules of the game and demand payments for FHA loans based on Conjectural Extrapolation Sampling, and Quicken Loans shares those concerns.

22.     As an unmatched large lender that produces top quality loans for the FHA program, Quicken Loans should be lauded as an example for other FHA lenders, as HUD well knows.  But HUD apparently has had its hand forced in how it administers the FHA program.

23.     In this light, and in the face of the DOJ and HUD-OIG's repeated threats of an improper and heavy-handed False Claims Act lawsuit designed to injure the company's reputation, Quicken Loans had no other option than to file

this lawsuit.  Through this action, Quicken Loans seeks to restore and strengthen its relationship with HUD and demands that the FHA program be administered in accordance with HUD's own published regulations, procedures, and practices, and be prohibited from using arbitrary and capricious procedures, like Conjectural Extrapolation Sampling, that HUD has publicly promised it would not use.

24.     Quicken Loans also seeks this Court's intervention because there is no basis for the Defendants' contention that a material percentage of the FHA loans made by Quicken Loans from 2007-2011 were improperly underwritten or out of program compliance.  Previously, before the investigation began, HUD reviewed a number of these loans and, except in a few rare instances, either concluded the loans met all FHA guidelines or that any issues were immaterial or had been cured. Quicken Loans believes that the latter is true for the body of these loans, and vigorously rejects Defendants' assertion that a large number of the loans made from 2007-2011 had "defects."  The resulting dispute between Defendants and Quicken Loans should be resolved by this Court.

25.     Quicken Loans accordingly seeks two basic rulings from the Court: (a) that Defendants cannot determine the quality and compliance of loans through their newly fabricated Conjectural Extrapolation Sampling rather than through the loan-by-loan approach that was applicable at the time the loans were originated and upon which Quicken Loans relied; and (b) that the loans Quicken Loans made

between 2007-2011 in fact were originated properly by Quicken Loans in accordance with the applicable FHA guidelines and program requirements, and pose no undue risk to the FHA insurance fund.

26.     With respect to the first of those issues, Defendants' use of Conjectural Extrapolation Sampling to evaluate the Subject Loans should be declared unlawful, and enjoined, for three basic reasons.  First, regardless of the merits of Defendants' Conjectural Extrapolation Sampling, Defendants cannot abandon the existing individualized approach retroactively for previously-originated loans.  Not only have Defendants provided no justification for such a retroactive change, but HUD had expressly stated, in its Federal Register release, that these previously-originated loans would be evaluated on an individual basis. Moreover, these were the established procedures and the contract terms at the time Quicken Loans underwrote and obtained insurance for the loans and were the procedures (and risks assumed) upon which Quicken Loans relied in participating in the program.   Second, it is HUD, rather than the DOJ or HUD-OIG, that is empowered to determine how lender compliance with underwriting standards, FHA guidelines and program requirements will be evaluated.  On information and belief, HUD has reaffirmed since its 2013 Federal Register notice that no form of sampling should be used to evaluate such compliance.  Finally, on its own merits, Defendants' proposed sampling approach is arbitrary and capricious, contrary to

the parties' contracts, and otherwise unlawful. As noted, making a loan is a highly

individualized, unique process that cannot reliably be evaluated any other way than

evaluating each borrower, property, and loan which is how HUD rightly requires

each borrower, property, and loan to be underwritten on an individualized basis. In

any event, Defendants' Conjectural Extrapolation Sampling, based on a cherry-

picked and miniscule fraction of loans that Quicken Loans originated, is

particularly unreliable and faulty -- and indeed has proven grossly inaccurate even

by the Defendants' own admissions.

27.     Separately, the Court should declare that the FHA loans that Quicken

Loans made from 2007-2011 were originated by Quicken Loans properly and in

compliance with all requirements, and do not pose an undue risk to the FHA

insurance fund. Defendants' contrary assertions, with respect to a fraction of the

few loans that they actually examined through the use of Conjectural Extrapolation

Sampling, are incorrect.

### THE PARTIES

28.     Plaintiff Quicken Loans Inc. is a Michigan corporation with its

principal place of business in Detroit, Michigan.

29.     Defendant United States of America is the federal government of the

United States.

30.     Defendant the United States Department of Housing and Urban Development ("HUD"), administers the FHA loan program and is a federal agency within the meaning of the Administrative Procedures Act ("APA"), 5 U.S.C. § 551(1).

31.     Defendant Julián Castro, as Secretary of the United States Department of Housing and Urban Development (the "Secretary"), is named as a Defendant in the complaint in his official capacity.

32.     Defendant the United States Department of Housing and Urban Development Office of Inspector General ("HUD-OIG") is responsible for conducting and supervising audits, investigations, and inspections relating to the programs of HUD, and is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

33.     Defendant David A. Montoya, as Inspector General for the United States Department of Housing and Urban Development, is named as a Defendant in the complaint in his official capacity.

34.     Defendant the United States Department of Justice ("DOJ") is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

35.     Defendant Eric Holder, as Attorney General of the United States Department of Justice (the "Attorney General"), is named as a Defendant in the complaint in his official capacity.

36.     Attorney General Holder, Secretary Castro, and Inspector General Montoya are each empowered and required to administer their respective agencies and departments.  28 U.S.C. §509 (DOJ); 42 U.S.C. §3532 (HUD); 5 U.S.C. App. § 4 (OIG).  In their official capacities, each is responsible for the acts and omissions by those employed in their agencies and departments, and for the acts and omissions taken or committed in the name of the agency or department they administer.  Attorney General Holder, Secretary Castro, and Inspector General Montoya will be bound to carry out the Court's orders when relief is granted in favor of Quicken Loans.

## JURISDICTION AND VENUE

37.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1346, 2201, and 2202 and 5 U.S.C. §§ 702-704.

38.     Venue in this Court is proper for each of the following separate reasons:  (a) Plaintiff resides in this judicial district, (b) a substantial part of the events giving rise to Plaintiff's claims occurred in this judicial district, and (c) one or more of the Defendants resides in this judicial district.  28 U.S.C. § 1391(e).

39.     Defendants have waived sovereign immunity with respect to Plaintiff's claims in this case.  See 12 U.S.C. § 1702; 5 U.S.C. §§ 701-706.

# GENERAL ALLEGATIONS

## A.    THE FHA LOAN PROGRAM

40.    No matter how thoroughly and carefully a loan is underwritten, every loan presents a risk that it will not be repaid and a loss will result even after the property securing the loan is sold through foreclosure.  Borrowers become ill, die, lose their jobs, get divorced or otherwise lose their ability or willingness to re-pay the loan.  Such events are not known or predictable with any certainty at the time the loan is made.  However, the process of loan underwriting attempts to evaluate certain credit risks on an individualized, borrower-by-borrower basis, in an effort to reduce (but not eliminate) the potential for a loss.

41.    Underwriting is not and has never been an exact science.  Even according to the FHA guidelines, underwriting requires judgment and discretion by the lender in considering many factors that affect the lending decision.  Furthermore, even when good faith errors in following underwriting guidelines occur (*e.g.*, miscalculating a borrower's income) such errors may not be the cause of the loss incurred.

42.    Because loan underwriting, by itself, cannot eliminate the risk of loss, mortgage default insurance is a common way to help lenders (and ultimately borrowers and homeowners) manage and spread the risks of losses that may be

incurred, so that lenders can provide homeownership and financing opportunities to otherwise underserved borrowers.

43. HUD's mortgage default insurance program is commonly referred to as the FHA program, after the Federal Housing Administration (the "FHA"), an agency within HUD that maintains a Mutual Mortgage Insurance Fund (the "Fund") for loans that HUD guarantees. Borrowers of these FHA-insured loans pay premiums for the government-backed mortgage insurance, which protects the lender from certain credit risks if the borrower, for whatever reason, defaults on the loan resulting in a loss. The FHA collects the premium on behalf of the Fund. When the lender or noteholder incurs a loss on an FHA loan, such as if the value of the property after default is less than the amount owed on the loan, an insurance claim can be made upon the Fund to recover the loss.

44. The FHA has delegated the task of underwriting FHA loans to FHA-approved lenders. Lenders with a demonstrated track record, known as Direct Endorsement Lenders ("DEL"), are authorized to originate FHA loans and endorse the FHA insurance at point of origination. For each loan originated, the FHA issues the lender a Mortgage Insurance Certificate. Pursuant to HUD's regulations (24 C.F.R. § 203.257), that certificate creates a contract of insurance between HUD and the lender.

18

45.     The FHA insurance program was created by the National Housing Act of 1934, as part of the New Deal when the housing industry was flat on its back from the Great Depression.  It has since been the bedrock of our nation's commitment to increasing homeownership opportunities for all and addressing instability in the housing market.  The program helped transform our country from a nation of renters into a nation of homeowners.

46.     Over its history, the FHA and the insurance program have assisted military families, served the elderly, and assisted the handicapped, among many others.  When lower income Americans and borrowers with a past financial hardship were deemed unfit for homeownership in the eyes of traditional mortgage lending, time and time again those borrowers were aided by the FHA and the insurance program.  In the 1940s, the FHA assisted veterans returning from war and their families in obtaining homeownership.  In the 1970s, in the face of skyrocketing oil prices and ever-increasing inflation that drove up the prices of every day staples, the FHA offered emergency assistance to borrowers to help keep them in their homes.  And more recently, in the wake of the financial crisis the insurance program was often the only option for borrowers wanting to climb out of a once-in-a-century economic crisis by putting a roof over their heads.  The FHA and the mortgage insurance program, simply put, is synonymous with the American dream of homeownership.

19

47.     In originating a loan for insurance as part of the FHA program, approved lenders use underwriting guidelines, mortgagee letters, the FHA's automated underwriting tool (called TOTAL Scorecard), guidance from FHA employees, experience, and sound judgment to underwrite, approve and fund the transaction.  Direct Endorsement Lenders are empowered to endorse the FHA insurance at the point of origination, under authority delegated to them by the FHA.  However, adherence to FHA guidelines does not guarantee or insure against the borrower going into default or that a loss will not be incurred.  Hence, the reason to have insurance is to help lenders manage the risk.

48.     The FHA has certain well-established processes and practices in place to monitor whether particular loans were underwritten in accordance with program requirements and to seek a remedy if a loan is not.  The centerpiece of those efforts is the FHA's Post Endorsement Technical Reviews, also known as PETRs.  These reviews are conducted by the FHA on a subset of every lender's loans.  If the FHA believes, after that review, that a loan was not underwritten properly or fails program requirements, the FHA notifies the lender of its preliminary finding.  The lender then can provide a response.  Based on the response, the FHA often decides its finding was in error or that the lender has mitigated the concern.  The FHA also conducts on-site audits, among other activities.

49.     Historically, if the FHA determined that underwriting errors or other factors result in a risk to the Fund from a potential default on a particular loan, the FHA obtained indemnification from the lender against having to pay on the default insurance. On information and belief, until very recently, this indemnification remedy has been the method FHA used to address loan underwriting deficiencies.

## B.     QUICKEN LOANS' STRONG RELATIONSHIP WITH FHA

50.     Since August 2007, Quicken Loans has made nearly 250,000 FHA loans. Quicken Loans is currently ranked as the largest volume FHA lender in the country.

51.     As an integral part of its participation in the FHA program, Quicken Loans always has worked closely with FHA officials and employees. At the FHA's request, Quicken Loans has been asked for advice about how the FHA might improve the program. Even when not asked, Quicken Loans has approached the FHA and the local Homeownership Centers to suggest changes to the program that would reduce risk, protect the Fund, and better assist borrowers.

52.     Quicken Loans also works on HUD initiatives and priorities outside of the FHA program. Prominently, Quicken Loans has worked with HUD and the City of Detroit to renew urban neighborhoods. HUD has issued numerous grants aimed at renewing and revitalizing Detroit, and Quicken Loans has contributed to that goal by bringing over 10,000 full-time jobs to downtown Detroit, investing with its

related companies over $1.7 billion into the City of Detroit, and has engaged in numerous civic and community projects and initiatives.

53.     Quicken Loans' leadership in the renewal of Detroit is in some sense no different than its leadership in the FHA insurance program.  Quicken Loans is not only the largest FHA lender today, it has the best loan quality score among the largest 30 FHA lenders.  That score, known as the Compare Ratio, was developed by the FHA to judge lenders' quality by measuring the performance of loans made by each lender against all other lenders.  A score of 100 means the lender is average, while a score under 100 is awarded to those lenders whose loan quality is superior.  Quicken Loans' most-recent Compare Ratio is 42%.  Put another way, for every dollar paid by the Fund on a claim of one of the loans it makes today, Quicken Loans saves the Fund more than a dollar because it is twice as good as the average lender and that remains tops among all large FHA lenders in the nation.

54.     Quicken Loans is and has been a strong supporter of the FHA program and the loans it has made have contributed to the recent and overall solvency of the Fund.

55.     Given Quicken Loans' history of strong quality and cooperation with and assistance to the FHA, it was a surprise, then, when Quicken Loans received notice in April 2012 that the DOJ and HUD-OIG were investigating Quicken Loans' participation in the FHA program.  The agencies assured Quicken Loans

that the inquiry was not because of any concern about Quicken Loans' superior loan quality or any concern about Quicken Loans' collaborative work with the FHA, but instead that Quicken Loans was selected for review because it was a large lender.

56.    The investigation has dragged on for three years.  Quicken Loans gathered, reviewed and produced over 85,000 records; turned over certain loan-specific information on about 1,400 loans; and numerous company team members testified under oath or were interviewed.  The scope of the investigation as it currently stands concerns FHA loans that Quicken Loans made (other than so-called FHA Streamline loans) from mid-2007, when it resumed FHA lending, until December 31, 2011 (we refer to loans under investigation as the "Subject Loans").

57.    Through it all, and despite the risk of further retribution, Quicken Loans continued to make tens of thousands of high quality FHA loans because it is committed to the FHA program.  The FHA and HUD were fully aware of the investigation, yet encouraged Quicken Loans to continue to do business with them. The FHA and HUD were obviously very comfortable that Quicken Loans was and is a strong and reliable business partner.  In fact, Quicken Loan is not only the largest FHA lender in the country, but the highest quality lender as well.

## C.   THE DEFENDANTS ABANDON FHA'S BUSINESS PRACTICES TO PURSUE THEIR APPARENT POLITICAL AGENDA

58.    At the same time, the DOJ and HUD-OIG apparently concluded that pursuing FHA lenders aggressively was a lucrative business and politically beneficial.  Through a series of settlements, DOJ, HUD and HUD-OIG collected more than $3 billion for their coffers from other lenders to resolve alleged claims of improper underwriting and FHA program compliance.  It also commenced several lawsuits against other lenders who were not so cooperative.  On information and belief, based on these successes, DOJ and HUD-OIG decided to pursue the same strategy with Quicken Loans, even though there was no legitimate basis for doing so, other than Quicken Loans being one of the largest FHA lenders.

59.    To execute on this strategy, the Defendants decided to completely abandon the principle, established by the FHA's practices and procedures and through the contract between Quicken Loans and HUD, that any consideration of whether an FHA loan was underwritten properly or otherwise met program rules must involve a review of the facts or circumstances related to that particular loan. This principle, which is referred to herein as the Loan-Level Mandate, is required by the program and has always been how FHA operated the program.  The Loan-Level Mandate is an integral part of the parties' understandings and agreement for

making FHA loans.  In fact, unique and specific borrower, property, and loan

circumstances are the reasons lenders underwrite loans individually.

60.     The Loan-Level Mandate is required by the very nature of FHA

insurance.  When an FHA loan is endorsed, the lender is issued an insurance

certificate that provides coverage against certain types of losses from a loan default

that may occur on that loan.  As with any insurance, the insurer (in this case the

FHA) sometimes contends that it can deny, avoid, or repudiate its coverage

obligations because the insurance should not have been bound in the first place.

FHA sometimes takes exactly that position:  the FHA can and does contend in

particular instances that it has no insurance duty, and so should not pay a present or

future claim, for a particular loan when that loan was not underwritten properly.  In

those instances, the existence of the coverage and claim obligation can only be

determined by looking at the specific loan in question.

61.     Recognizing that, the FHA program always has been built and

operated on the Loan-Level Mandate.  Indeed, whether conducting a pre- or post-

endorsement review, audit, or seeking indemnification, the FHA has always, as is

contemplated by its regulations (24 C.F.R. § 203.255) and guidelines, reviewed

loans individually, and never by extrapolation, conjecture or speculation.  This

process afforded the lender the opportunity to discuss the facts and circumstances

of each loan individually, and present the FHA with documents, compensating

factors, and explanations for why the loan complies with good underwriting practice and proper requirements and does not prevent an undue risk to the Fund.

62.     As noted above, the FHA program has always included PETRs of closed loans by HUD, in order to monitor loan quality.  That process has always been performed on an individual basis, involving discussions between expert underwriting and production staff at FHA and their counterparts at the lender about whether a particular loan was defective or out of compliance.  Where a loan is discovered with a material issue that presents a substantial increased risk to the Fund, indemnification of the Fund against future claim exposure is the rational and equitable remedy.

63.     Over the course of years, FHA issued over 500 PETR findings to Quicken Loans.  After these individual loan conversations, and Quicken Loans' rebuttals and mitigation efforts, nearly all of the findings have been resolved without requiring indemnification.  Indeed, in the most recent final data of its third quarter 2014 PETR findings issues, the FHA concluded that 98% of Quicken Loans' loans were compliant.  In all, over the years, out of 246,000 FHA loans made from 2007 to 2011, there has only been a need for 56 indemnification agreements between Quicken Loans and the FHA, which works out to 1 indemnification agreement for every 4,393 loans made by Quicken Loans.

64.   The FHA also has monitored loan quality in other ways – including on-site loan reviews.  In the most recent on-site review, FHA raised no issue with nearly 98% of Quicken Loans' FHA loans.

65.   HUD and the FHA have never used any type of loan sampling to calculate some sort of "defect" rate of a population of loans that, when extrapolated across a larger group of loans, would be the basis for some sort of demand for indemnity or reimbursement in gross, let alone treble damages and penalties.

66.   Any sampling approach, especially Conjectural Extrapolation Sampling, would be the antithesis of what is required by the Loan-Level Mandate, and flatly inconsistent with the terms under which Quicken Loans and other FHA lenders have always participated in the FHA program.  Being exposed to a post hoc recapture of claim payment, not based on the facts, is not what Quicken Loans (or any lender) signed up for when agreeing to make FHA loans.  Quicken Loans is not an insurer or reinsurer of loan default risk – that is FHA's role.  The Loan-Level Mandate recognized that, while protecting the Fund in the case of established legal responsibility of Quicken Loans on a particular loan under specific facts.

67.   HUD recognizes that the FHA program is built on intelligent loan-level reviews based on the specific facts and circumstances pertaining to each loan,

not Conjectural Extrapolation Sampling.  In July 2013, HUD published a notice in the Federal Register seeking comments on how it might improve its quality assurance process.  78 Fed. Reg. 41075 (July 9, 2013) (the "Solicitation for Comments").  One topic HUD requested comments on was whether the FHA should change its process and abandon the Loan-Level Mandate in favor of Conjectural Extrapolation Sampling, as a way to force lenders to pay FHA based on a theoretical defect rate rather than a loan-level discussion:  "FHA would use the statistical sample, to estimate the defect rate on each lender's overall FHA portfolio and . . . have the lender compensate FHA for the estimated total risk to FHA resulting from the lender's origination processes."

68.     Recognizing that any use of sampling would notably represent a complete sea change and undermine every lender's understanding of how the FHA program works, but HUD explicitly provided that extrapolation sampling, if adopted, would not be retroactive and apply to loans closed before any new protocol:  "Any changes initiated as a result of this solicitation will be prospective only, and will not apply to any pending claims, reviews, or enforcement actions."

69.     The DOJ and HUD-OIG's investigation of Quicken Loans was pending at that time.  In short, HUD promised in the Federal Register notice that no sampling-methodology would be applied to Quicken Loans for any loans made up to that point.

70.     Unfortunately for Quicken Loans, Defendants, pushed by the DOJ and HUD-OIG, broke that promise.  Driven by the apparent political agenda to collect as much as possible from large FHA lenders, regardless of any real liability and facts, the Defendants abandoned the Loan-Level Mandate and long-time productive collaboration that FHA and Quicken Loans had engaged in together whenever questions of loan quality arose.

71.     Not long after the commencement of the investigation, FHA announced in a letter dated June 24, 2013, that it was suspending both the PETR process and all HUD Quality Assurance Division reviews of self-reported loans for Quicken Loans, as to the Subject Loans. The notice went so far as to state that FHA would not even respond to any question or request by Quicken Loans to discuss a single one of those loans.

72.     On information and belief, this decision to eschew the Loan-Level Mandate was made by the DOJ and HUD-OIG so that HUD would not make admissions to Quicken Loans that its loans did not have defects, which would have undermined the DOJ and HUD-OIG investigation.  Indeed, the DOJ and HUD-OIG have effectively taken over the HUD process of quality assurance as to the loans involved in the investigation, exercising the functions of HUD's Quality Assurance Division in those respects, all in service of a larger agenda that is apparently divorced from the FHA program.

29

73.     Ignoring the Loan-Level Mandate, the DOJ and HUD-OIG announced
to Quicken Loans that Defendants would now use Conjectural Extrapolation
Sampling to judge Quicken Loans' underwriting for the loans under investigation.
The DOJ and HUD-OIG then took a miniscule "sample" of 116 cherry-picked
loans, mostly from 2008-09 – out of more than 100,000 non-streamline FHA loans
made in the relevant period – and announced to Quicken Loans that they had
determined that the underwriting nearly half of the "sample" was "defective."

74.     Many of the loan "defects" the DOJ and HUD-OIG identified in the
sample were not legitimate or were immaterial, as discussed below.  Had the Loan-
Level Mandate been honored, and the loans made the subject of ordinary-course
discussion between experts at the FHA and Quicken Loans, the loans in the
miniscule "sample" subset would have been resolved (and subject to
indemnification if appropriate).  But the decision by the DOJ and HUD-OIG to
take over FHA's business process prevented those discussions from occurring. The
errors and immateriality of the so-called "findings" supports the conclusion that
this was a process likely driven by apparent political considerations and a highly
public federal lawsuit to threaten Quicken Loans into paying an unwarranted
settlement and publicly admitting to wrongdoing that the Company did not
commit, not one designed to protect the Fund from legitimate risk.

75.     Quicken Loans has reminded the DOJ, HUD-OIG and HUD that the FHA program is built on the Loan-Level Mandate, not flawed shortcuts like Conjectural Extrapolation Sampling.  Quicken Loans also has pointed out to the DOJ, HUD-OIG and HUD that HUD had promised quite specifically in the most public of writings – the Federal Register – that if any type of sampling ever were to be adopted to judge loan quality and to govern the FHA program's participants, that approach would not apply retroactively.  Quicken Loans repeatedly requested Defendants to have a loan-by-loan discussion of all loans that the DOJ, HUD-OIG, HUD or the FHA (or anyone) had any concern about.  Quicken Loans repeatedly offered to make its entire staff available for those discussions, expeditiously and in good faith.  Although the Defendants briefly entertained that process as part of their investigation, they refused to undertake that process to resolve the body of claims made on the Subject Loans.  Instead, the DOJ and HUD-OIG demanded, with HUD's participation, that Quicken Loans pay a large financial penalty as supposed reimbursement for losses that did not occur and publicly admit to wrongdoing that the company did not commit, or face a False Claims Act lawsuit alleging fraud and seeking treble damages, at the significant risk of damaging the company's well-deserved reputation and goodwill.

76. The Defendants' abandonment of the Loan-Level Mandate in favor of Conjectural Extrapolation Sampling despite HUD's promises not to apply any sampling approaches at all, is arbitrary and capricious and contrary to law.

### D. THE DEFENDANTS' CLAIMS OF "DEFECTIVE" LOANS ARE WRONG

77. During the course of the investigation, the DOJ and HUD-OIG have identified to Quicken Loans, by loan number and file, a very limited number of loans (only 55) that they hypothesized were not underwritten properly. But the supposed defects claimed by Defendants do not exist for most of those loans.

78. Many of the loans were categorized as "defective" by Defendants because facts or documents allegedly were missing in the loan file. But in many cases the facts were proven and the documents were there. In other cases, the supposed "defect" was that the loan did not meet FHA underwriting guidelines. But those assertions were erroneous, because the DOJ and HUD-OIG had used the wrong FHA guideline.

79. In one loan, Quicken Loans was accused of poor underwriting because it miscalculated an FHA applicant's monthly income, when the error was only $2.10. Under FHA guidelines, and common sense, an immaterial difference like this is no bar to insurability.

80.     Another supposed loan "defect" occurred when Quicken Loans told an FHA borrower to bring $125 to closing even though it had approved the loan believing the borrower only needed to bring $48 to closing.

81.     In another instance, a loan was pronounced "defective" by the DOJ and HUD-OIG because Quicken Loans supposedly loaned an FHA customer $26 too much on a $99,500 loan.

82.     These examples, and most of the other 55 loans the DOJ and HUD-OIG identified to Quicken Loans, were not underwritten improperly so as to create an undue risk of loss to the Fund, and do not amount to fraud or false claims.

83.     Defendants separately contend, through the use of Conjectural Extrapolation Sampling, that a substantial percentage of the Subject Loans were not originated properly, which Quicken Loans disputes.  Rather, Quicken Loans originated the Subject Loans appropriately and in compliance with the program, and the Loans do not pose an undue risk to the Fund.

84.     To be sure, underwriting is not an exact science and so some differences of opinion can arise; indeed, that is why FHA's underwriting standards are called "guidelines" rather than rules.  Even the lending experts at the FHA frequently reverse their opinion about whether an FHA loan has any quality issue. For instance, the FHA's most recent quarterly data from the PETRs of more-recent

industry-wide loans shows that the FHA reverses course, and issues loans a passing score, on nearly 85% of the loans it first presented with a material problem.

85.    Through training, monitoring, and feedback, Quicken Loans works to understand and apply FHA requirements correctly.  It conducts rigorous quality control, and the results are delivered to every key team member and officer, all the way up to the Chairman and the CEO of the company.  Quicken Loans even underwrites every FHA loan twice in order to do its best to catch and correct material mistakes, where most other lenders only underwrite the file once.

86.    Quicken Loans acknowledges that, despite all of these protections, it provides indemnification to HUD with respect to any individual loan, where Quicken Loans is responsible for a material defect.  The rate of material errors in the loans Quicken Loans underwrites is extremely low – about 2% by HUD's own measures.  Defendants' contention that this happened in thousands of instances of loans that later became a claim against the Fund is not true.

87.    There is a ripe dispute between the parties about whether the Subject Loans met applicable, material underwriting and FHA standards, were properly insured, and do not pose undue risks to the Fund which require indemnification.

## COUNT I
## Violation of the APA's Prohibition of
## Arbitrary and Capricious Agency Action

88.    The allegations contained in Paragraphs 1 - 87 are incorporated by

reference as if set forth in full herein.

89.    Defendants' conduct is arbitrary and capricious in violation of the

APA in three respects:  (1) Defendants have, without justification, retroactively

abandoned the Loan-Level Mandate (either directly or by causing HUD to do so)

and instead applied Conjectural Extrapolation Sampling; (2) the Conjectural

Extrapolation Sampling approach used by the Defendants constitutes an arbitrary,

capricious, unreliable and faulty means of evaluating loan quality and compliance;

and (3) Defendants' conclusion that a substantial fraction of the Subject Loans

were "defective" is arbitrary, capricious, and inaccurate.

90.    As set forth above in the discussion HUD has a demonstrated a pattern

and practice of engaging Quicken Loans, and other lenders, with a Loan-Level

Mandate.

91.    Despite and contrary to this established practice and its foundations in

the nature of FHA insurance and program requirements, HUD, with the

involvement and direction of the other Defendants, arbitrarily and capriciously

suspended the Loan-Level Mandate and its normal course of conduct in engaging

with Quicken Loans on an individualized loan basis, to the detriment of Quicken

35

Loans. The Defendants have instead judged the quality and compliance of the Subject Loans using Conjectural Extrapolation Sampling , which is unreliable, unjustly designed to overstate the level of findings and faulty. Defendants have done so after HUD publicly stated in the Solicitation for Comments that no form of sampling would be applied retroactively to the population of Subject Loans.

92. Defendants' conduct in suspending any loan-by-loan review, and then retroactively pursuing Conjectural Extrapolation Sampling after stating that sampling would not be used to evaluate these loans, constitutes an unlawful, arbitrary, and capricious final agency action under 5 U.S.C. § 706(2).

93. Even apart from its improper manner of retroactive adoption, Conjectural Extrapolation Sampling is itself unreliable, arbitrary and capricious. HUD undertakes a loan-by-loan review in its endorsement reviews and audit process because a loan-by-loan review is the only way to correctly determine if a loan complies with FHA guidelines. The Loan-Level Mandate is also required by the nature of FHA insurance. Use of any sampling approach will not correctly identify a single loan in particular that is non-compliant. Defendants' use of Conjectural Extrapolation Sampling as a vehicle to hypothesize that loans underwritten by Quicken Loans do not comply with FHA guidelines is unfair, unreasonable and faulty. Accordingly, Defendants' use of Conjectural

Extrapolation Sampling constitutes unlawful, arbitrary and capricious final agency action under 5 U.S.C. § 706(2).

94.    Defendants' conclusion, purportedly based on their new sampling methodology, that a substantial fraction of the Subject Loans were not originated in compliance with the FHA guidelines is itself arbitrary, capricious, and inaccurate. In fact, Quicken Loans originated the Subject Loans properly and in compliance with the program.  Accordingly, Defendants' contrary conclusion constitutes unlawful, arbitrary, and capricious final agency action under 5 U.S.C. § 706(2).

95.    Quicken Loans is therefore entitled to declaratory, injunctive, and further relief as set forth below.

## COUNT II
### Violation of the APA's Prohibition of Agency Action Not in Accordance With Law

96.    The allegations contained in Paragraphs 1 - 87 are incorporated by reference as if set forth in full herein.

97.    Defendants' conduct is contrary to law, in violation of the APA, in three respects: (1) the retroactive switch to Conjectural Extrapolation Sampling, from the existing loan-by-loan methodology, to assess the Subject Loans is unlawful; (2) the use of any sampling is, in any event, not a lawful methodology to assess whether loans were properly underwritten; and (3) Defendants' conclusion that a substantial percentage of the Subject Loans were not originated properly and

in compliance with the FHA program requirements is erroneous and therefore contrary to law.

98.     First, Defendants' retroactive adoption of Conjectural Extrapolation Sampling to assess loans that were previously originated is contrary to law.  As set forth above in the discussion of HUD's Loan-Level Mandate, and in accordance with its regulations under 24 C.F.R. § 203.255 and elsewhere, HUD has evaluated FHA loans originated by Quicken Loans, and other lenders, on a loan-by-loan basis.  Defendants' retroactive use of Conjectural Extrapolation Sampling to judge loan quality of the previously-originated Subject Loans in the investigation, after stating in the Solicitation for Comments that no sampling would be so used, is contrary to law, in violation of 5 U.S.C. § 706(2).

99.     Second, apart from its manner of adoption, any sampling approach would be contrary to law.  HUD's regulations and guidelines, set forth in 24 C.F.R. § 203.255 and elsewhere, establish that HUD would review compliance with FHA guidelines only on a loan-by-loan review.  Sampling is also inconsistent with the nature of FHA insurance.  Defendants' abandonment of the Loan-Level Mandate constitutes a final agency action and its use of Conjectural Extrapolation Sampling is not in accordance with law under 5 U.S.C. § 706(2).

100.    Third, Defendants' conclusion that a substantial fraction of the Subject Loans violated the applicable FHA guidelines, and that Quicken Loans should pay "damages" to Defendants, is incorrect and contrary to law.

101.    Quicken Loans is therefore entitled to declaratory, injunctive, and further relief as set forth below.

## COUNT III
### Violation of the APA's Prohibition of Agency Action
### Not in Accordance With Law

102.    The allegations contained in Paragraphs 1 - 87 are incorporated by reference as if set forth in full herein.

103.    On information and belief, informed by the nature of the comments received as a result of the Solicitation for Comments, the fact HUD has not proposed to implement any sampling even though the Solicitation for Comments was issued almost two years ago, and the fact any sampling would be inconsistent with the nature of FHA insurance and the FHA program, HUD has concluded that it will not use any sampling as a basis to demand indemnification or other payment for alleged lender errors.

104.    HUD – not DOJ and not HUD-OIG – has sole authority over how to administer the FHA program and carry out the statutory obligations and mission of the FHA program.

105.   Defendants' application of Conjectural Extrapolation Sampling to any set of loans, including the Subject Loans in the investigation, is arbitrary and capricious and contrary to law in light of HUD's final determination that no sampling will be used to assess loan quality for purpose of obtaining reimbursement or indemnification from lenders participating in the FHA program.

### COUNT IV
### Declaratory Judgment and Injunctive Relief for
### Non-Breach of Contract

106.   The allegations contained in Paragraphs 1 - 87 are incorporated by reference as if set forth in full herein.

107.   Under 24 C.F.R. § 203.257, the issuance of a Mortgage Insurance Certificate to an approved mortgagee for an individual loan creates a contract for insurance between HUD and the mortgagee.  Tens of thousands of such contracts on individual loans were created between HUD and Quicken Loans during the time period at issue.  The DOJ, HUD-OIG and HUD are now acting in a manner inconsistent with the terms of those contracts.

108.   Quicken Loans is entitled to a declaratory judgment that Defendants cannot use any sampling, especially Conjectural Extrapolation Sampling, to determine whether each individual contract was in compliance with FHA guidelines.  Because of the nature of underwriting loans, as set forth above, determining if any contract was breached because the loan failed to comply with

40

FHA program guidelines cannot be determined without reviewing each individual loan file and cannot be done on a sampling basis.

109.   Quicken Loans is also entitled to a declaratory judgment that it did not breach any individual insurance contract with HUD because, for each contract, it underwrote the loan properly and complied with the FHA guidelines and the terms of each contract.

110.   Quicken Loans is also entitled to injunctive relief prohibiting the Defendants from using any sampling to determine whether the subject loans were properly originated.  As set forth above, determining if any contract was breached because the loan was improperly underwritten or otherwise failed to comply with FHA program guidelines cannot be determined without reviewing each individual loan file.  Using any sampling approach would improperly result in the erroneous conclusion that individual contracts were breached, because the loan failed to comply with underwriting or FHA requirements, although the loan was in fact fully compliant.

111.    Quicken Loans is therefore entitled to declaratory, injunctive, and further relief as set forth below.

### COUNT V
### Violation of the Due Process Clause of the Fifth Amendment

112.   The allegations contained in Paragraphs 1 - 87 are incorporated by reference as if set forth in full herein.

113.   The Fifth Amendment of the United States Constitution provides that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law."

114.   Defendants' abandonment of the Loan-Level Mandate and stated intention to use Conjectural Extrapolation Sampling (either directly or by failing to continue the Loan-Level Mandate) to determine the quality and compliance of the subject loans, after declaring in the Solicitation for Comments that sampling would not be used, violates Quicken Loans' right to due process.

115.   First, Defendants' switch to determining compliance with FHA guidelines for the Subject Loans through Conjectural Extrapolation Sampling rather than through an individual examination, after declaring in the Solicitation for Comments that no sampling would be used, and without any intervening procedure or process, is improper and violates Quicken Loans' right to due process.

116.   Second, the Conjectural Extrapolation Sampling that the Defendants have adopted to determine compliance itself violates Quicken Loans' right to due process because it will produce entirely unreliable, inaccurate and faulty hypothesis.

117.   Third, Defendants' erroneous hypothesis, based on that Conjectural Extrapolation Sampling approach, that a substantial fraction of the Subject Loans were not originated properly or in compliance with FHA requirements, and that

Quicken Loans should pay "damages" to Defendants, violates Quicken Loans' right to due process.

118.   Quicken Loans is therefore entitled to declaratory, injunctive, and further relief as set forth below.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that this Court:

(a)     Issue a declaratory judgment that Defendants cannot use any sampling to determine whether any (or how many) of the Subject Loans were properly underwritten and originated in compliance with FHA program requirements;

(b)     Issue an injunction prohibiting Defendants from using any sampling to determine whether any (or how many) of the Subject Loans were properly underwritten and originated in compliance with FHA program requirements and from initiating or pursuing any suit or other proceeding based on or using such any sampling, including without limitation any suit under the False Claims Act;

(c)     Issue a declaratory judgment that each Subject Loan was properly underwritten and originated by Quicken Loans in compliance with FHA program requirements, and that any variance from those standards is immaterial and does not pose an undue risk to the Fund so as to require indemnification;

(d)    Award Quicken Loans its attorneys' fees and costs incurred in

connection with this matter; and

(e)    Grant Quicken Loans such other and further relief as is deemed just

and equitable.

## JURY TRIAL DEMAND

Quicken Loans demands a jury trial as to all issues thus triable.

Respectfully submitted,


QUICKEN LOANS INC.

By its attorneys,

/s/ Jeffrey B. Morganroth
**Jeffrey B. Morganroth**
**MORGANROTH & MORGANROTH,**
**PLLC**
344 North Old Woodward Avenue, Suite 200
Birmingham, MI 48009
Tel.:  248.864.4000
Fax.:  248.864.4001
jmorganroth@morganrothlaw.com
P41670

Thomas M. Hefferon
**GOODWIN PROCTER LLP**
901 New York Avenue, NW
Washington, DC  20001
Tel.:  202.346.4000
Fax.:  202.346.4444
thefferon@goodwinprocter.com


Dated:      April 17, 2015